FIFTH DIVISION
March 17, 2006

No. 1-03-1152

| | | |
|---|---|---|
| In re: KATRINA, KENYA, KENNY, and KARL R., Minors, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Respondents-Appellees, | ) ) | |
| (The People Of The State Of Illinois, | ) ) | Nos. 96 JA 2326-28 97 JA 826 |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | |
| Eddie R., | ) ) | Honorable David Erickson, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE O'BRIEN delivered the opinion of the court:

Respondent, Eddie R., appeals the orders of the circuit court finding him an unfit parent and terminating his parental rights. We affirm.

Respondent is the biological father of the four children, Kenny (age 15), Katrina (age 13), Kenya (age 12), and Karl (age 9). Leaner S. is the children's biological mother.

On January 15, 1995, this case was referred for intact family services at Catholic Charities after two-year-old Katrina was taken to Cook County Hospital because she had a rubber band on her wrist that was blocking her circulation and causing her wrist to turn blue and cold to the touch. Additionally, Leaner S. and Kenya had both tested positive for the presence of controlled substances at Kenya's birth on February 5, 1994.

On May 3, 1996, the State filed petitions for adjudication of wardship and motions for temporary custody as to Kenny, Katrina, and Kenya. The petitions alleged the following grounds: (1) the children were neglected, in that their environment was injurious to their welfare;

(2) Katrina was physically abused; (3) Kenya was neglected due to being a drug-exposed infant; and (4) the children were abused due to a substantial risk of physical injury. Specifically, the petitions alleged that Leaner S. had not complied with drug treatment services, that respondent had not complied with drug urine drops, that on or about December 29, 1994, Katrina sustained cuts, welts, and bruises as a result of physical abuse by Leaner S., and that Kenya was born with a controlled substance in his urine.

On May 6, 1996, following a temporary custody hearing at which neither parent was present and which proceeded by stipulation, the trial court found probable cause that Kenny, Katrina, and Kenya were abused and neglected, and that it was a matter of immediate and urgent necessity to remove them from their parents' care pending an adjudicatory hearing. The court granted temporary custody of the children to the guardianship administrator of the Illinois Department of Children and Family Services (DCFS) pending the adjudicatory hearing.

On June 5, 1996, following a second temporary hearing, the trial court entered a second temporary custody order again making findings of probable cause and immediate and urgent necessity to remove the children from their parents' care pending an adjudicatory hearing.

On September 9, 1996, following an adjudicatory hearing, the trial court found that: (1) the children were neglected, due to an injurious environment; (2) the children were abused, due to a substantial risk of physical injury; (3) Katrina was abused due to excessive corporal punishment; and (4) Kenya was neglected, due to being a drug-exposed infant.

On October 3, 1996, following a dispositional hearing, the trial court found that both respondent and Leaner S. were unable to care for Kenny, Katrina, and Kenya. The court

appointed DCFS as the children's guardian.

On February 25, 1997, the State filed a petition for adjudication of wardship and a motion for temporary custody of the other child, Karl. Karl's petition alleged that he was: (1) neglected due to an environment injurious to his welfare; (2) neglected due to being a drug-exposed infant; and (3) abused due to a substantial risk of physical injury. Specifically, the petition alleged the following facts: (1) that on or about February 14, 1997, Karl was born testing positive for opiates or other metabolite in his blood/urine; (2) Karl's five older siblings, including Kenny, Katrina, and Kenya, were in DCFS custody; and (3) Karl's brother Kenya had been born exposed to controlled substances. Karl was made a ward of the court and placed under DCFS guardianship on September 29, 1997.

Meanwhile, on July 28, 1997, and August 11, 1997, the Cook County Public Guardian filed an emergency motion to discontinue the parents' contact with Kenny, Katrina, and Kenya. The public guardian alleged that Kenny, Katrina, and Kenya made outcries of sexual abuse by respondent on April 19, 1997, and that Kenny also made an outcry of sexual abuse on May 27, 1997. On September 10, 1997, the court suspended respondent's contact with Kenny, Katrina, and Kenya.

On September 29, 1997, the court ordered Circle Family Care (CFC) to schedule a sexual offenders' evaluation for respondent. On April 23, 1998, the court found that respondent had not made substantial progress toward the return home of the children. On May 6, 1998, the court again ordered CFC to assist respondent in obtaining a sexual offenders' evaluation.

On April 21, 1999, respondent filed a motion for supervised visits with all four children.

In his motion, respondent alleged that he completed the court-ordered sexual offenders' evaluation and that the evaluation was "inconclusive." The sexual offenders' evaluation is not in the record on appeal. On May 18, 1999, the court allowed CFC therapist Clifford Smith to conduct supervised therapy sessions between respondent and the children.

On July 7, 1999, the court again found that respondent had not made substantial progress. The court, however, reinstated respondent's supervised visits on July 28, 1999.

On June 17, 2000, the public guardian filed an objection to the hearing officer's recommended permanency goal of returning the children home. In the objection, the public guardian attached a document drafted by CFC caseworker Jessica Craig, which provided the court with a history of the allegations of the case as well as recent developments. Ms. Craig reported that on May 19, 1997, Kenya and Katrina made outcries that respondent put his penis in their mouth. In March 2000, Katrina stated that respondent had made her "suck his wee-wee." Ms. Craig reported that Katrina "was masturbating to the point of bleeding and inflicting bodily harm." Ms. Craig also reported that Kenny was "displaying some very aggressive and disturbing behaviors" including fights with his siblings and classmates, and that his grades had "declined tremendously." Ms. Craig stated Kenny had said on several occasions that he did not want to visit with respondent or Leaner S.

On June 19, 2000, the court entered an order finding that Kenny would not be forced to attend supervised visits with respondent.

On January 10, 2001, the public guardian filed an emergency motion to suspend respondent's visits with Karl. Karl reported that he experienced an upset stomach and vomiting

when he participated in visits. The trial court granted the motion on January 11, 2001.

On January 14, 2003, the public guardian filed an emergency motion to temporarily suspend visits between Katrina and Leaner S. The guardian stated in the motion that Katrina had alleged since 1997 that respondent had sexually abused her, and that Katrina had been receiving counseling through the Child Abuse Unit for Studies, Education and Services (CAUSES) since August 2001. The motion alleged that Leaner S. denied Katrina's claim of sexual abuse and that Leaner S. showed an "inability to disengage from her relationship with [respondent.]" The public guardian's motion referenced the most recent counseling report generated by CAUSES, which noted that as of November 2001, Katrina's accusation of sexual abuse by respondent remained consistent. The trial court suspended all visits between Katrina and Leaner S. until further order of the court.

The State filed petitions to terminate respondent's and Leaner S.'s parental rights. At the fitness hearing, respondent stated that he had documentation showing that he successfully completed individual counseling. However, respondent stated that he had not brought the documentation to court for the hearing.

Respondent testified that he participated in a sex offender evaluation and that the evaluator "closed the case based on the fact that there was nothing to indicate or suggest [respondent] was a sexual offender." Respondent further claimed that he had completed all of the services asked of him since 1996, but he admitted that he did not bring to court any documentation to confirm his claim.

Respondent testified that he was engaged in counseling with Clifton Smith in 1999, but

that Mr. Smith terminated the counseling when respondent refused to admit his sexual abuse of the children. Respondent stated that he was not offered further counseling through any other service provider after his counseling with Mr. Smith ended.

Jessica Craig, the children's case manager at CFC from June 1998 to June 2000, testified that she referred respondent for individual counseling with Clifton Smith. She did not believe that respondent successfully completed therapy based on a July 1999 therapy report.

Ms. Craig testified that in May 2000, CFC conducted a staffing related to the sexual abuse allegations. Respondent, Leaner S., Kenny, and Katrina were present at the staffing. Katrina was asked in her parents' presence if respondent had sexually abused her. Katrina stated that respondent "put his pee pee in her mouth." Ms. Craig estimated that Katrina was six or seven years old when she made this statement. Respondent denied Katrina's allegation.

Ms. Craig testified that in a 2000 client service plan, respondent was rated unsatisfactory because he had never addressed the children's allegations of sexual abuse against him. Ms. Craig could not recommend unsupervised visits for respondent because he never completed counseling.

Rashawn Jamison, the CFC case worker for the children from May 1, 2001, until August 2001, testified that during that period of time respondent was permitted weekly supervised visits with his children. Ms. Jamison testified that respondent did not attend any visits during the time she was assigned to the case. Ms. Jamison was not able to recommend unsupervised visits for respondent because of his noncompliance with services.

Respondent testified that he visited with his children "each and every time that a visit has

been allowed period." During his cross-examination, however, respondent admitted that he sent a letter dated January 14, 2002, to former caseworker Corey Junkins. In the letter, respondent stated that he would not be attending visits because he believed that Mr. Junkins was "practicing social work without a license" and that respondent could "ill afford to comport with [Mr. Junkins]."

Respondent testified that he last visited two of the children on or about January 17, 2003, and he admitted that the visit violated a court order. Respondent testified that he could not remember attending any visits in 2002 and that he "sporadically" visited with the children in 2001. Respondent testified that at one point in 2001 he was only permitted visits with Kenya. Respondent admitting telling CFC that he did not visit with Kenya then because he did not want the other children to feel "deprived."

At the conclusion of the fitness hearing, the trial court found that respondent was unfit under subsections (b) and (m) of section 1(D) of the Adoption Act (750 ILCS 50/1(D)(b), (D)(m) (West 2002)). The court found that respondent: (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare; and (2) failed to make reasonable progress toward the return of the children within nine months after the adjudication of neglect.

The court then commenced the best interest phase of the termination hearing. At the hearing, Kathleen Trudelle testified that she was assigned to the children's cases in October 2000 as a special service probation officer in Cook County. Special service probation officers are assigned by the court in cases involving allegations of sexual abuse or assault. Ms. Trudelle acted as an advocate and mentor for the children and made sure that appropriate services were in

place.

Ms. Trudelle testified that she attended administrative case reviews, ensured the children were in appropriate individual therapy, took the children on outings, and made visits to the children's foster home and school. All the children except Karl needed individual therapy after being assessed for services. CAUSES provided the children's therapy.

Ms. Trudelle testified that since autumn 2000 when she was assigned to the case, the children had been with their foster mother, Ms. B. Ms. B wants to adopt the children. Based on Ms. Trudelle's visits to the foster home in 2003, she believed the children had adequate sleeping arrangements and the home was safe and appropriate. Ms. Trudelle had no concerns about all four children living with Ms. B, and she had no concerns regarding Ms. B's ability to meet the children's special needs with ongoing counseling. Ms. Trudelle determined that the children were very bonded to Ms. B and perceived her as their parent.

Ms. Trudelle testified that she spoke to the children individually in her last in-person visit with them on March 31, 2003. Karl told her that he wanted to live with Ms. B. Kenya told her that "[adoption] would be okay with [him.] He responded to it." Katrina told her that she wanted to stay with Ms. B, whom she called "mom." Katrina further stated that she wanted to be able to live with both Ms. B. and Leaner S. Kenny stated that he wanted to be adopted by Ms. B.

Ms. Trudelle testified that she believed it was in the children's best interests for parental rights to be terminated and for the court to appoint a guardian with the right to consent to the children's adoption. She made this recommendation because the children were bonded to Ms. B. as a "family unit."

Allison Brown, a licensed clinical professional counselor employed by CAUSES, testified that she had been Katrina's individual therapist for just under two years. Katrina came to CAUSES because she had alleged sexual abuse by respondent. During the therapeutic sessions, Katrina consistently maintained that respondent sexually abused her. In the therapy sessions, Katrina made progress in dealing with the sexual abuse allegation. Early in treatment, Katrina described nightmares and feelings of anger and fear toward respondent. She had since reported that her nightmares and anger have decreased.

Ms. Brown recommended termination of parental rights because Katrina needed stability and permanency regarding her home. Additionally, Katrina was well tied to her foster family and she felt safe and comfortable with them. Ms. Brown recommended that Ms. B.'s adoption of Katrina would be in her best interest upon termination.

Olubukola Komolafe, a CFC case manager, testified that she was assigned to the case in February 2003. Ms. Komolafe visited the four children individually in March 2003. She asked each child where he or she wanted to live, and all four said they wanted to remain in the foster home.

Ms. Komolafe testified that the foster home was safe and appropriate, with no unusual incidents having occurred since she had been assigned as case manager. The children felt safe in the home with Ms. B., and they seemed attached to her. They referred to her as "mom."

Ms. Komolafe testified that it was in the children's best interests to terminate parental rights and appoint a guardian with the right to consent to their adoption because the children had been placed with Ms. B. since 1997 and "they just want to settle down with her."

No. 1-03-1152

Respondent testified on his own behalf. Respondent stated that he was never allowed unsupervised visits with the children. He claimed to have attended each visit that had been allowed. He also claimed to have given the children cards and gifts.

During his testimony, respondent identified an audio tape he retrieved from his answering machine on August 13, 2002. Respondent testified that he recognized the voices of Kenya, Karl, and Katrina, as well as the voice of Leaner S., who was on the tape suggesting that the children leave messages to respondent. The court admitted the tape into evidence. While the tape was played in court, respondent identified the voices of the children. The children called respondent "daddy" and did not address him as "Eddie."

Respondent testified that on December 17, 2002, he had a visit with Katrina and Kenya. Respondent thought that the visit went well because both children were glad to see him and they expressed their affection. Respondent claimed that during the visit, both children expressed a desire to return to him. Respondent also testified that Katrina told him she gets whippings at the foster home.

Respondent testified that he was currently employed at a construction company and that he was able to support the children if they returned home to him. He purchased a four-bedroom home in April 2003 and currently lived alone there. Respondent believed that the children should be returned to his care because Ms. B. had eight people living in her home, including her boyfriend and a boyfriend of her daughter. Respondent did not think that Ms. B. had enough room in her house, and he testified that he could provide a better living environment for the children.

No. 1-03-1152

Respondent's daughter Kia was called as a witness on behalf of her father. Kia was 19 years old and had lived with respondent for her entire life until June 2002, when she moved in with her mother. Kia testified that respondent gave her affection while she lived with him and that respondent did a good job in raising her.

Following all the evidence, the trial court found that it was in the children's best interests to terminate parental rights and appoint the DCFS guardianship administrator with the right to consent to adoption. Respondent filed this timely appeal.

I. Findings of Parental Unfitness

The Juvenile Court Act of 1987 provides a two-stage mechanism whereby parental rights may be involuntarily terminated. 705 ILCS 405/2-29(2) (West 2002). Under this bifurcated procedure, there must be a threshold showing of parental unfitness based on clear and convincing evidence and then a subsequent showing that the best interests of the children are served by severing parental rights. In re M.J., 314 Ill. App. 3d 649, 655 (2000).

The trial court's determination of parental unfitness involves factual findings and credibility assessments that the trial court is in the best position to make. In re M.J., 314 Ill. App. 3d at 655. Therefore, the appellate court defers to the trial court's factual findings and will not reverse the trial court unless the factual findings are against the manifest weight of the evidence. In re M.J., 314 Ill. App. 3d at 655. A factual finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, and not based on the evidence presented. In re M.J., 314 Ill. App. 3d at 655.

No. 1-03-1152

Parental unfitness is determined with reference to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2002)). The State must prove by clear and convincing evidence at least one statutory ground of parental unfitness. In re M.J., 314 Ill. App. 3d at 655. On review, if there is sufficient evidence to satisfy any one statutory ground, we need not consider other findings of parental unfitness. In re M.J., 314 Ill. App. 3d at 655.

In the present case, the trial court found respondent unfit under section 1(D)(b) of the Adoption Act. Section 1(D)(b) provides that a person may be declared an unfit parent for "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2002). In evaluating an allegation under section 1(D)(b), the trial court must focus on the reasonableness of the parent's efforts and not on his success and must consider any circumstances that made it difficult for the respondent to show interest, concern, or responsibility for the well-being of the children. In re M.J., 314 Ill. App. 3d at 656.

The record amply supports the trial court's finding that respondent failed to maintain a reasonable degree of interest, concern or responsibility for the children's welfare. Specifically, Kenny, Katrina, and Kenya made outcries of sexual abuse by respondent on April 19, 1997, and Kenny also made an outcry of sexual abuse on May 27, 1997. The court ordered CFC to schedule a sexual offender's evaluation for respondent. Respondent claims that he completed the court-ordered sexual evaluation; the sexual offenders evaluation is not in the record on appeal. Respondent was referred to CAUSES for a second sexual offenders evaluation. Respondent refused to attend, claiming that the first sexual offenders evaluation did not find he had the potential for deviant sexual behavior and that there was no basis for a second sexual offenders

˘12˘

No. 1-03-1152

evaluation.

Respondent has not included the first sexual offenders evaluation in the record on appeal, and thus it is unclear what recommendations, if any, that evaluation made. The record does contain a one-page letter from Dr. Andre Rousseau, titled "Confidential Progress Report." The letter states that Dr. Rousseau had completed the sexual offenders evaluation and was awaiting the results, which he believed would be negative. The remainder of the letter makes clear that Dr. Rousseau had not yet seen the results at the time he wrote the letter. Respondent, as the appellant, has the burden of providing a complete record on appeal. Foutch v. O'Bryant, 99 Ill. 2d 389, 391-92 (1984). In the absence of the results of the first sexual offenders evaluation, we presume that CFC's directive to participate in a second evaluation and the court's recognition of this necessity were proper. Foutch, 99 Ill. 2d at 392. Respondent's refusal to submit to the second evaluation provides support for the trial court's finding that he failed to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare.

Other evidence further supports the trial court's finding. In a service plan dated January 20, 2000, covering the period from January 20, 2000, through July 31, 2000, respondent was rated unsatisfactory in the goal of addressing/acknowledging the sexual allegations made against him by his children. In a service plan covering the period from March 20, 2001, to July 8 2001, respondent was found unsatisfactory on the task of choosing a provider to address the issue of sexual abuse. Respondent was also rated unsatisfactory in signing consents to release information.

Further, Jessica Craig, the children's case manager at CFC from June 1998 to June 2000,

testified that she referred respondent for individual counseling with Clifton Smith. Ms. Craig testified that respondent did not successfully complete the therapy. In a July 23, 1999, progress report from therapist Clifton Smith, Mr. Smith stated that as "[respondent] has continued to feel indifferent toward sharing personal information and does not see a benefit in the treatment process, there does not appear to be a benefit in continuing any form of treatment with him." Ms. Craig testified that she was unable to recommend unsupervised visits for respondent because of his noncompliance with counseling. Rashawn Jamison, the CFC caseworker for the children from May 1, 2001, until August 2001, also testified that she was unable to recommend unsupervised visits for respondent because of his noncompliance with services. All of this evidence demonstrates the respondent's failure to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare.

Respondent contends, though, that he denied the sexual abuse charges because they were not true. Respondent argues that "there was no way that counseling could continue in the face of [his] denial of that abuse, and his refusal to complete a second sex offender evaluation required by CAUSES. Thus, it was impossible for [respondent] to complete the most important service that was required for reunification as long as he persisted in his denial of abusing his children." Respondent further contends that he was faced with the choice of incriminating himself (by admitting to the sexual abuse charges) or otherwise losing his parental rights.

The record belies respondent's argument. Clifton Smith indicated that counseling was ended, not because respondent refused to admit to sexually abusing his children, but because respondent was "indifferent" toward sharing personal information and did not see a benefit in the

treatment process. Also, the January 20, 2000, service plan only required respondent to "address" or "acknowledge" the abuse allegations. Neither term required an admission of guilt but, rather, required a recognition that the children were traumatized to the point to even raise the allegation. Further, the trial court expressly noted at the end of the best interests hearing:

"At no time *** did I ever suggest to you or say to you that you need to walk in and admit something; that you had to admit there was sexual abuse; that you had to admit you became a pedophile. That was never to be the issue ***. You had a daughter who said it happened. She never recanted that. I heard that testimony at least three times about Katrina. My daddy made me put his penis in my mouth, or whatever the exact testimony was. Whether it happened or not, that girl was in need of extensive, extensive kinds of therapy and counseling to deal with those issues, as were the other children involved in this.

That kind of counseling then has a derivative effect on your relationship with your children. And that meant at some point, yes, a second sexual offender assessment so that the people involved in all of this *** could feel with some certainty *** there was the effort shown on your part to somehow become involved in the services necessary to bring the reconciliation, reattachments to your children.

And what I think they saw, and maybe a line was drawn in the sand. If it was, certainly every time a worker or a counselor tried to cross it, you stood firmer and fought."

As discussed, the record supports the trial court's findings that respondent failed to

become involved in the services necessary to bring about reconciliation with his children. Respondent's failure to participate in the necessary services supports the finding of unfitness.

Also, respondent's failure to engage in consistent visitation supports the finding of unfitness. The record contains respondent's January 14, 2002, letter to CFC in which he told the caseworker Corey Junkins that he would not attend any scheduled visits until the next court date because he believed that Mr. Junkins was "practicing social work without a license" and that respondent could "ill afford to comport with [Mr. Junkins]." Another CFC caseworker, Rashawn Jamison, testified that during the three months she was assigned to the case, from May to August 2001, respondent did not attend any visits despite being offered weekly supervised visitation. Also, respondent testified that at one point in 2001 he was only permitted visits with Kenya. Respondent admitting telling CFC that he did not visit with Kenya because he did not want the other children to feel "deprived."

Respondent's failure to engage in consistent visitation, coupled with his repeated failure to participate in the services necessary for a reconciliation with his children, support the trial court's finding that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare. Accordingly, we affirm the finding of unfitness.

## II. The Best-Interest Finding

At the best-interest stage of termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination is in the children's best interest. In re T.A., 359 Ill. App. 3d 953, 961 (2005). The trial court's finding that termination is in the children's best interest will not be disturbed unless it is against the manifest weight of the

No. 1-03-1152

evidence.  In re T.A., 359 Ill. App. 3d at 961.

Section 1-3(4.05) of the Juvenile Court Act of 1987 provides the following factors to
consider when determining the children's best interests:

"(a) the physical safety and welfare of the child***;

(b) the development of the child's identity;

(c) the child's background and ties ***;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued
***;

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence ***;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child."  705  ILCS 405/1-
3(4.05) (West 2003).

The trial court properly considered the statutory factors in determining that the best

interest of the children necessitated termination of respondent's parental rights.  In making its

finding, the trial court stated:

>"In the best interest of these four children, I honestly believe that their feeling of
>security; their familiarity as pointed out in the statute; the sense of love and affection they
>receive; the least disruptive placement for their lives at this point; their long-term goals
>and where they should be in finishing school and having a family; their community ties,
>including school and friends that have been in effect for now almost seven years; the
>children's need for permanency, and that includes [the] need for stability and continuity
>and not to be ripped from a home again, and for Karl the only home he has ever known, it
>sits with the foster parents. *** Therefore, the court terminates the parental rights of
>[respondent]."

The court's findings are supported by the evidence.  Kathleen Trudelle, who was assigned

to the case in October 2000 as a special service probation officer, testified that the children were

bonded to the foster mother, Ms. B., and perceived her as their parent.  Ms. Trudelle testified that

the foster home was safe and appropriate.  Ms. Trudelle spoke with each of the four children

individually on March 31, 2003.  Karl, Kenya, and Kenny each told her that they wanted to

continue living with Ms. B.  Katrina stated that she wanted to live with both Ms. B and with

Leaner S.  Ms. Trudelle testified that it was in the children's best interest for parental rights to be

terminated and for the court to appoint a guardian with the right to consent to the children's

adoption.

Allison Brown, who had been Katrina's individual therapist, testified that Katrina was

well tied to her foster family and felt safe and comfortable with them.  Ms. Brown recommended termination of parental rights because Katrina needed stability and permanency regarding her home.  Ms. Brown also stated that Ms. B.'s adoption of Katrina would be in her best interest upon termination of parental rights.

Olubukola Komolafe, a CFC case manager, testified that she visited with the four children individually in March 2003.  All four children told her that they wanted to remain in the foster home.  Ms. Komolafe further testified that the foster home was safe and appropriate, that the children felt safe with Ms. B., and they seemed attached to her.  Ms. Komolafe testified that it was in the children's best interest to terminate parental rights and appoint a guardian with the right to consent to their adoption.

All of this evidence supports the trial court's finding that it was in the children's best interest to terminate respondent's parental rights.  The trial court's findings were not against the manifest weight of the evidence.  Accordingly, we affirm the order terminating respondent's parental rights.

For the foregoing reasons, we affirm the circuit court.

Affirmed.

GALLAGHER, P.J., and O'MARA FROSSARD, J., concur.