NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (4th) 210005-U

NOS. 4-21-0005, 4-21-0006, 4-21-0007 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 21, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.L., S.L., and T.L., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County |
| Petitioner-Appellee, | ) | Nos. 18JA39 |
| v. | ) | 18JA40 |
| LaShea L., | ) | 18JA41 |
| Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | Thomas E. Little, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed, holding the trial court did not err in terminating respondent's parental rights.

¶ 2     In February 2018, the State filed a petition for adjudication of neglect or abuse with respect to M.L., S.L., and T.L., the minor children of respondent, LaShea L. In April 2018, the trial court adjudicated the minors abused and neglected, made them wards of the court, and placed custody and guardianship with the Department of Children and Family Services (DCFS). The State filed a motion to terminate respondent's parental rights in February 2020. Following hearings on the State's motion in October and November 2020, the court found respondent an "unfit person" within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). The court then held a best-interests hearing in December 2020, where the court found it

was in the minors' best interests to terminate respondent's parental rights.

¶ 3        In January 2021, respondent moved to consolidate the three cases into this one appeal, and we granted the motion. On appeal, respondent argues the trial court erred in terminating her parental rights; specifically, she alleges the trial court's unfitness findings and best-interests determination stand against the manifest weight of the evidence. We affirm.

¶ 4                                I. BACKGROUND

¶ 5        On February 6, 2018, the State filed a petition for adjudication of neglect with respect to M.L. (born December 22, 2013), S.L. (born June 1, 2012), and T.L. (born March 3, 2015), minor children of respondent mother (LaShea L.), alleging the children were neglected and abused under various sections of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a), (b), (2)(ii) (West 2018)). After a shelter care hearing, the trial court issued an order, to which respondent mother stipulated, finding probable cause for abuse and neglect based upon a lack of supervision and failed intact services. The trial court placed temporary custody and guardianship of the children with DCFS.

¶ 6        DCFS previously opened an intact family services case for LaShea L. and her three children. The family's home lacked electricity, they were staying with family, the children slept together in one bed, and they lacked adequate food. DCFS provided intact services to assist LaShea L. with housing and stabilizing the family. LaShea L. frequently left the children—ages two, four, and five—with inappropriate caregivers, she missed visits with the children, and she engaged minimally in the services DCFS offered, resulting in the State eventually filing a petition to revoke supervision and proceed with petitions seeking to have the children adjudicated neglected.

¶ 7        As a result of the probable cause finding and temporary placement of the children,

DCFS established a caregiver service plan for LaShea L., setting the following goals: participate in a parenting assessment and parenting education services; establish stable housing; remain free from all criminal involvement; complete drug screens as requested; consistently attend and appropriately participate in visitation with the children; and actively and honestly participate in a mental health assessment to determine treatment needs and follow any treatment recommendations.

¶ 8                                    A. Adjudicatory Proceedings

¶ 9            On April 19, 2018, the trial court issued an adjudicatory order finding: The minors were abused and neglected as defined by section 2-3 of the Juvenile Court Act (705 ILCS 405/2-3 (West 2018)), in that the minors suffered from a lack of support, education, and remedial care as defined by section 2-3(1)(a) (705 ILCS 405/2-3(1)(a) (West 2018)); the minors were in an environment that was injurious to their welfare as defined by section 2-3(1)(b) (705 ILCS 405/2-3(1)(b) (West 2018)); and the minors were at substantial risk of physical abuse as defined by section 2-3(2)(ii) (705 ILCS 405/2-3(2)(ii) (West 2018)). The court based its findings on the following facts: "[the] children [were] left with people for days with no plan or provision, environmental issues, [and] failure to provide [for the children's] basic needs." The court then found respondent mother inflicted the abuse or neglect. The court determined the State proved its allegations of abuse or neglect by a preponderance of the evidence, but it also noted respondent mother was in default because she did not appear for the hearing, even though she received personal service and proper notice. Respondent mother had failed to appear since the initial admonishment on the petitions in March 2018.

¶ 10           The trial court also issued a dispositional order on April 19, 2018, finding LaShea L. unfit, unable, and unwilling to care for, protect, train, educate, supervise, or discipline

the children and determining placement with her is contrary to the children's health, safety, and best interests because of "mother's lack of providing for [the children's] basic needs, incomplete, inadequate care plans when leaving [the children] with others; and mother failed to appear and [had] defaulted." The court granted the State's petition, adjudicated the children abused and neglected, and made them wards of the court. The court ordered DCFS to maintain custody and guardianship over the children.

¶ 11                     B. Termination of Respondent's Parental Rights

¶ 12            On February 7, 2020, the State filed a motion seeking a finding of unfitness and termination of the parental rights of LaShea L. to M.L., S.L., and T.L. The State alleged LaShea L. was an unfit person pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). The State's petition identified five counts as to respondent mother: (1) LaShea L. had failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) LaShea L. had failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minors from the parent during any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2018)); (3) LaShea L. had failed to make reasonable progress toward the return of the minors to the parent during any nine-month period following the adjudication of neglect, specifically the nine-month period between April 19, 2018, and January 19, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2018)); (4) LaShea L. had failed to make reasonable progress toward the return of the minor to the parent during any nine-month period following the adjudication of neglect, specifically the nine-month period between January 19, 2019, and October 19, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2018)); and (5) LaShea L. had failed to make reasonable progress toward the return of the minor to the parent during any nine-month period following the adjudication of

neglect, specifically the nine-month period between April 27, 2019, and January 27, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 13    The State further contended termination of LaShea L.'s parental rights was in the children's best interests and asked for custody and guardianship to remain with DCFS, giving it the authority to consent to the children's adoption.

¶ 14    In October 2020, the trial court held a fitness hearing. LaShea L. attended the hearing represented by counsel. The State called four witnesses. Lindsay Lyon, director of DCFS Supportive Services for Webster-Cantrell Youth Advocacy (Webster-Cantrell), testified she supervised LaShea L.'s case beginning in October 2018. Lyon testified DCFS referred LaShea L. to Webster-Cantrell for services but LaShea L. did not respond to Webster-Cantrell's initial attempts to contact her. For example, DCFS referred LaShea L. to Webster-Cantrell for counseling services in October and December 2018, but she did not respond either time. When DCFS made another counseling referral in September 2019, LaShea L. responded and scheduled counseling sessions for October and November. She failed to attend any of the five counseling appointments. Webster-Cantrell rescheduled those appointments for December and January, but she did not attend those sessions either. Lyon also testified LaShea L. received a housing voucher in 2018 and elected to use it for renting a house. LaShea L. lost the voucher, however, when she failed to engage in services. Lyon finally testified Webster-Cantrell staff encouraged LaShea L. to participate in services when she attended family meetings.

¶ 15    Christine Foster, a parenting educator for Webster-Cantrell, testified she worked with LaShea L. during the intact case and again when DCFS referred LaShea L. for intensive one-on-one parenting classes in March 2018. Foster administered the initial parenting assessment, and LaShea L. scored in the high risk category for four of the five constructs,

namely: appropriate expectations, empathy, reversing family roles or rules, and parent attendance. LaShea L. scored in the medium risk category for the fifth construct, belief in corporal punishment. Foster testified LaShea L. failed to attend "a lot" of parenting-education appointments. Foster reached out to LaShea L. again in September 2018 and kept reaching out until LaShea L. finally responded in February 2019. Foster testified she readministered the parenting assessment in February. LaShea L. attended three sessions before she began canceling or failing to attend. Foster testified she kept trying to contact LaShea L. but she did not respond to those attempts until May 2019. Again, LaShea L. attended a few parenting education sessions but then disengaged. Foster stated LaShea L.'s best participation came in July and August 2019 when she reengaged in parenting services. Foster testified LaShea L. completed the parenting class in August 2020. She explained it generally takes parents 32 to 36 weeks to complete the parenting classes but it took LaShea L. more than 100 weeks to complete the curriculum. Foster testified LaShea L. showed improvement during reassessments but because she still scored in the medium- and high-risk ranges, she did not show sufficient improvement to regain custody of the children.

¶ 16        The State next called Skylar Kovach, a visitation specialist at Webster-Cantrell, to testify. She testified she supervised LaShea L.'s weekly visits with the children. She recalled she began supervising the visits in March or April 2018 and continued supervising them through the life of the case. Kovach testified LaShea L. attended 95 visits and missed 21 visits during the time span of April 2018 to September 2020. Kovach described how LaShea L.'s level of participation varied, saying sometimes LaShea L. engaged in the visits and sometimes she was withdrawn. Kovach testified LaShea L. frequently ended visits early or arrived unprepared to care for the children. Kovach observed LaShea L. displayed few nurturing skills during the

visits. Kovach opined LaShea L. watched the children rather than interacting with them. Kovach testified LaShea L. displayed affection towards the children when greeting them or leaving them but not throughout the visit. Kovach testified LaShea L. did not progress to having more visits or unsupervised visits with her children.

¶ 17        Heather Smith, a DCFS child specialist, testified as the State's final witness. Smith stated she worked as the caseworker assigned to respondent mother's case since April 2019. She explained she reviewed the entire file and testified LaShea L. received unsatisfactory ratings during service plan evaluations in August 2018, February 2019, and August 2019, citing lack of progress in meeting the service plan goals. Smith also testified DCFS requested LaShea L. undergo drug screenings but she never went for testing. Smith finally testified that LaShea L. initiated treatment at Heritage Behavioral Health Center in 2020 without a referral from DCFS.

¶ 18        Neither LaShea L. nor the guardian *ad litem* (GAL) presented any evidence during the fitness hearings.

¶ 19        In its closing statement, the State argued LaShea L. met the definition of an "unfit person" because she failed to make reasonable efforts to correct the conditions that provided the basis for removing the children from her custody and she failed to make reasonable progress toward the return of the children to her during any nine-month period alleged in the petitions. The State recapped the witness testimony and elaborated that LaShea L. failed to complete any services before February 2020. It acknowledged LaShea L. completed parenting classes in August 2020, but since "she went up in some things and down in others *** it was not necessarily considered a successful completion of parenting services."

¶ 20        LaShea L.'s counsel argued LaShea L. was not unfit because she participated in

some services, namely weekly visitation with the children and parenting education. Counsel argued the State did not meet its burden to show LaShea L. failed to make reasonable progress and effort.

¶ 21 The GAL argued the State proved all five unfitness allegations by clear and convincing evidence. The GAL specifically noted LaShea L.'s "three client service plans *** were all rated unsatisfactory."

¶ 22 The trial court rendered its decision on the record, recounting in detail the testimony from every witness and making credibility determinations. The court found the State's witnesses to be credible. The trial court expressly stated: "I do find that the State has proven by clear and convincing evidence that the mother, [LaShea L.] is an unfit parent for reasons set forth in [the petition]."

¶ 23 C. Best-Interests Hearing

¶ 24 The trial court held the best-interests hearing in December 2020. The State called the children's new DCFS caseworker, Deanna Willis, as its lone witness. Willis testified she prepared a best-interests report for the hearing. Willis stated she recommended LaShea L.'s parental rights be terminated. Willis testified the children remained in foster care. She explained M.L. and T.L. were placed together in a traditional foster home. She stated M.L. and T.L. had acclimated into the foster home and were considered part of the family. Willis stated M.L. was doing well in school. She acknowledged the children had been moved five times prior to their current placements.

¶ 25 Willis's best-interests report detailed the children's condition. The report documented how M.L. and T.L.'s foster parent met the children's medical, emotional, and developmental needs while also providing love, nurturing, and support. By way of examples, the

foster parent secured counseling services for M.L. to stabilize her tantrums and defiance and assisted in getting T.L. help with his speech. The report noted M.L. and T.L.'s foster parent is willing to provide them permanence. Per Willis's report, S.L. lived with her paternal grandmother, who ensured S.L.'s medical, emotional, and developmental needs were met and provided S.L. with love, nurturing, and support. S.L. was doing well in school. The report noted S.L. was well integrated into the home and had a strong connection with her grandmother. S.L.'s grandmother acknowledged the importance of maintaining S.L.'s connection to her siblings and said she would facilitate that connection. The grandmother was willing to provide S.L. with permanency. Willis's report detailed how LaShea L. essentially stopped visiting her children after the fitness hearing, attending 3 of 16 visits. Willis noted: "The children ask often about their mom and display a lot of sadness when she does not attend the visits." Ultimately, Willis recommended that "it would be in [the children's] best interest to terminate [LaShea L.'s] parental rights so that permanency can be achieved."

¶ 26 The State asked the trial court to consider the best-interests report. With that, the State rested. Neither LaShea L. nor the GAL presented evidence at this hearing.

¶ 27 After the arguments of counsel, the trial court indicated it had considered the statutory best-interests factors, labeling the factors "most applicable under the circumstances" as: "the children's sense of attachment, where they feel a sense of security and continuity, and also their need for permanence including their need for stability and continuity of relationships with parent figures, with siblings, and other relatives." The court then reviewed Willis's written best-interests report and oral testimony, highlighting the following facts: M.L. and T.L.'s foster parent met all their needs; S.L.'s grandmother loved her and met all her needs; S.L. was doing well in school with no concerns; the children had been in care for over 1000 days; the foster

parents were committed to providing these children with permanence; and the children had grown to trust their caregivers. The trial court deemed Willis's testimony to be credible. Reviewing Willis's recommendations, the court stated: "There is no advantage to dragging this case out, and *** closure at least in terms of the mother's rights would be a benefit to the children." The court concluded the State proved by a preponderance of the evidence that it was in the minors' best interests that LaShea L.'s parental rights be terminated.

¶ 28    The trial court's written judgment outlined its findings from the fitness and best-interests hearings. Specifically, the court's order found: (1) the State had proven by clear and convincing evidence that LaShea L. was an unfit person within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) and (2) it was in the best interests of the minor children (M.L., S.L., and T.L.) and the public that LaShea L. have her residual parental rights and responsibilities terminated as to the children, and the children relieved of all obligations of obedience and maintenance with respect to LaShea L.

¶ 29    This appeal followed.

¶ 30                                    II. ANALYSIS

¶ 31    Respondent argues the trial court erroneously terminated her parental rights because the court's unfitness and best-interests determinations go against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 32    The Juvenile Court Act (705 ILCS 405/1 *et seq.* (West 2018)), and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)), govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494, 777 N.E.2d 930, 940 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights—the State must first show the parent is an "unfit person," and then the State must show terminating parental

rights serves the best interests of the child. *D.F.*, 201 Ill. 2d at 494-95 (citing the Adoption Act (750 ILCS 50/1(D) (West 1998)), and the Juvenile Court Act (705 ILCS 405/2-29(2) (West 1998))). Here, LaShea L. challenges the trial court's determinations at each of these steps. We take her challenges in turn.

¶ 33                                    A. Unfitness Finding

¶ 34            " 'The State must prove parental unfitness by clear and convincing evidence ***.' " *In re A.L.*, 409 Ill. App. 3d 492, 500, 949 N.E.2d 1123, 1129 (2011) (quoting *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067, 808 N.E.2d 596, 604 (2004)). The Adoption Act provides several grounds on which a trial court may find a parent "unfit," including: the parent's failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2018)); the parent's failure to make reasonable efforts to correct the conditions that were the basis for the removal of the minor from the parent during any nine-month period following the adjudication of neglect or abuse or dependency under the Juvenile Court Act (750 ILCS 50/1(D)(m)(i) (West 2018)); and the parent's failure to make reasonable progress toward the return of the child to the parent during any nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(ii) (West 2018)). Despite several potential bases for unfitness, "sufficient evidence of one statutory ground *** [is] enough to support a [court's] finding that someone [is] an unfit person." (Internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83, 19 N.E.3d 227; see also *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064, 859 N.E.2d 123, 135 (2006) ("A finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act.") (citing *In re D.D.*, 196 Ill. 2d 405, 422, 752 N.E.2d 1112, 1122 (2001)).

¶ 35            This court pays " 'great deference' " to a trial court's fitness finding " 'because of

[that court's] superior opportunity to observe the witnesses and evaluate their credibility.' " *A.L.*, 409 Ill. App. 3d at 500 (quoting *Jordan V.*, 347 Ill. App. 3d at 1067). We "will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record." *A.L.*, 409 Ill. App. 3d at 500. Since "[e]ach case concerning parental unfitness is *sui generis*, requiring a close analysis of its individual facts" (internal quotation marks omitted) (*In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19, 980 N.E.2d 91), we now turn our attention to the facts of this case.

¶ 36       The State alleged LaShea L. was unfit based on several statutory grounds. Three of the five counts cited LaShea L.'s failure to make reasonable progress toward the return of the children to the parent during any nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(ii) (West 2018)). The State identified three different nine-month periods: April 19, 2018, to January 19, 2019; January 19, 2019, to October 19, 2019; and April 27, 2019, to January 27, 2020. The trial court found that LaShea L. failed to make reasonable progress during any of those three nine-month periods, and she now challenges those findings as against the manifest weight of the evidence.

¶ 37       During the first nine-month period (April 19, 2018, through January 19, 2019), LaShea L. made little progress toward the return of her children. Despite receiving referrals for counseling from Webster-Cantrell, LaShea L. did not respond to the agency's attempts to contact her in October and December 2018. LaShea L. underwent a parenting assessment in 2018 but did not attend or engage in parenting classes. Likewise, she did not comply with three drug screen requests. LaShea L. often changed her phone number, which prevented DCFS or Webster-Cantrell staff from notifying her of drug screens or other service requests. LaShea L., however, did maintain stable housing during this time period. She also participated in weekly

visitation with her children, although she was often disengaged during the visits. LaShea L. received an unsatisfactory rating on her August 2018 service plan review.

¶ 38    During the second nine-month period (January 19, 2019, through October 19, 2019), LaShea L. again made little progress toward having her children returned to her care and custody. Due to her prior failure to attend parenting classes, she underwent another parenting assessment in February 2019. But, like before, she failed to follow up by attending or engaging in parenting classes. She did not respond to the parent educator's attempts to contact her until May 2019. She then attended three sessions but did not begin regularly attending parenting classes until July 2019. In September 2019, Webster-Cantrell again reached out to LaShea L. to begin counseling services. LaShea L. scheduled appointments for October, but she missed each one. LaShea L. maintained weekly visitation during this time period, yet her engagement with the children was minimal. LaShea L. received unsatisfactory ratings on her February 2019 and August 2019 service plan reviews.

¶ 39    During the third nine-month period (April 27, 2019, through January 27, 2020), LaShea L. failed to make progress toward having her children returned home. While she attended parenting classes, she failed to make significant gains in her parenting skills as evidenced through her disengaged behavior during visitation. Webster-Cantrell rescheduled the counseling appointments she missed in October and November 2019 for December 2019 and January 2020, but she did not show up for those appointments either. Webster-Cantrell eventually terminated the referral, citing LaShea L.'s lack of participation. As before, LaShea L. consistently attended her weekly visits with the children, but she often watched them rather than interacting with them.

¶ 40    No doubt to distract us from her earlier failures, LaShea L. points to evidence showing she eventually did what was asked of her. The record shows LaShea L. took steps

toward completing her services. She completed two parenting assessments, attended some parenting classes, and eventually completed the parenting curriculum in August 2020. But her minor progress often met major setbacks when she would disengage and not attend classes. She made slight improvement between her two parenting assessments, but Foster testified LaShea L. did not make enough progress in parenting classes to have her children returned to her. The record likewise shows LaShea L. attended most of her weekly visits with her children. The visitation specialist, however, testified that LaShea L. frequently ended visits early, arrived unprepared, and did not meaningfully interact with her children during visits. Kovach testified LaShea L. failed to make sufficient progress to have unsupervised visits with her children or even have supervised home visits.

¶ 41　　　　We cannot say LaShea L. demonstrated reasonable progress during any of the three nine-month periods the State identified. As we have previously explained, " 'reasonable progress is an 'objective standard,' " measuring whether " 'the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such quality that the court, in the *near future*, will be able to order the child returned to parental custody.' " (Emphasis in original.) *F.P.*, 2014 IL 140360, ¶ 88 (quoting *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991)). LaShea L.'s sporadic compliance with services from April 2018 to February 2020 was not of sufficiently demonstrable quality to have allowed the court to return the children to her custody in the *near future* because she could never sustain progress. Though she regularly visited her children, those visits did not progress to more frequent visits or unsupervised visits. And though she sporadically attended parenting classes, her parenting skills did not improve. Indeed, evaluators routinely rated LaShea L. as unsatisfactory in her service plan goals. See *In re K.H.*, 346 Ill. App. 3d 443, 455, 804 N.E.2d 1108, 1118

(2004) (explaining that section 1(D)(m)(ii) of the Adoption Act "mandates that parents must, with some degree of consistency, make reasonable progress toward their children's return home or risk forfeiting their parental rights").

¶ 42    Taken together, all the evidence relating to LaShea L. reveals she failed to make demonstrable, quality progress for any nine-month period of time the State identified in its petition. The State, therefore, proved LaShea L. an unfit parent by clear and convincing evidence. And since the evidence does not point to the opposite result, the trial court's unfitness finding that LaShea L. failed to make reasonable progress toward the children's return home during any of the three specified nine-month periods following the adjudication of neglect does not go against the manifest weight of the evidence. See *A.L.*, 409 Ill. App. 3d at 500.

¶ 43    Because we can affirm the trial court's unfitness finding on this basis, we need not consider the other statutory grounds on which the trial court found LaShea L. unfit. *A.L.*, 409 Ill. App. 3d at 501 ("[O]n review, if sufficient evidence is shown to satisfy any one statutory ground, we need not consider other findings of parental unfitness.") (citing *In re Katrina R.*, 364 Ill. App. 3d 834, 842, 847 N.E.2d 586, 593 (2006)).

¶ 44                    B. Best-Interests Determination

¶ 45    Once a trial court finds a parent an "unfit person," it must next consider whether terminating that person's parental rights serves the child's best interests. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004); see also *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80, 966 N.E.2d 1107 (stating once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). When considering whether termination of parental rights serves a

- 15 -

child's best interests, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2018). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *Daphnie E.*, 368 Ill. App. 3d at 1072; see also 705 ILCS 405/1-3(4.05)(a) to (j) (West 2018).

¶ 46 A trial court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16, 73 N.E.3d 616.

¶ 47 LaShea L. contends the trial court's determination that terminating her parental rights goes against the manifest weight of the evidence because "the children are bonded to her"

and "[i]t would be in the best interests of the children to grow up with their mother who loves them and has fought for them." LaShea L. claims she "did what was asked of her from her caseworker." The State, on the other hand, presented copious evidence showing that LaShea L. did not do what was asked of her and that terminating LaShea L.'s parental rights serves the best interests of the children. Through testimony and a written report from Willis, the State presented the court with the following evidence of the children's best interests: M.L. and T.L.'s foster parent meets all their needs and provides love, nurturing, and support; M.L. and T.L.'s foster parent assisted them with counseling and speech services; M.L. and T.L. developed a connection to their caregiver and seek her out when they need something; S.L. was happy in her current placement with her paternal grandmother; the grandmother ensured all of S.L.'s needs were met and provided love, nurturing, and support; S.L. was doing well in school; S.L. had a strong connection to her grandmother and extended family members; and all the children trusted their caregivers. The best-interests report documented the foster parent's and grandmother's willingness to maintain the children's relationships with each other.

¶ 48     The trial court identified two statutory factors as "most applicable" in its best-interests determination: first, "the children's sense of attachment, where they feel a sense of security and continuity"; and second, "their need for permanence including their need for stability and continuity of relationships with parent figures, with siblings, and other relatives." See 705 ILCS 405/1-3(4.05) (West 2018). After reviewing the above evidence—the best-interests report and Willis's testimony—the trial court echoed Willis's determination that "[t]here is no advantage to dragging this case out" and "closure at least in terms of the mother's rights would be a benefit to the children." Considering the statutory best-interests factors and the evidence before it, the trial court concluded that terminating LaShea L.'s parental rights served

the children's best interests. Since the evidence does not lead us clearly to opposite conclusions, we cannot say this best-interests determination goes against the manifest weight of the evidence.

¶ 49                                          III. CONCLUSION

¶ 50        For the reasons stated, we affirm the trial court's judgment.

¶ 51        Affirmed.