NO. 4-10-0925    Opinion Filed 4/14/11

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: A.L., a Minor, | ) | Appeal from |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Schuyler County |
| v. | ) | No. 08JA1 |
| ALYSSA MAYFIELD, | ) | |
| Respondent-Appellant. | ) | Honorable |
| | ) | Alesia A. McMillen, |
| | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Presiding Justice Knecht and Justice McCullough concurred in the judgment and opinion.

**OPINION**

In July 2010, the State filed a petition to terminate the parental rights of respondent, Alyssa Mayfield, as to her daughter, A.L. (born February 10, 2007). Following a November 2010 hearing, the trial court found respondent unfit. Immediately thereafter, the court conducted a best-interest hearing and determined that terminating respondent's parental rights would be in A.L.'s best interest.

Respondent appeals, arguing only that the trial court's fitness findings were against the manifest weight of the evidence. We disagree and affirm.

I. BACKGROUND

A. The Circumstances That Prompted the State's Motion
To Terminate Respondent's Parental Rights

In June 2008, the State filed a petition for adjudication of wardship, alleging that A.L. was a neglected minor in

that her environment was injurious to her welfare (705 ILCS 405/2-3(1)(b) (West 2008)). The State's petition was based on (1) respondent's admission that she smoked cannabis on a daily basis and (2) domestic-violence incidents that occurred between respondent and A.L.'s biological father, Slade Logan.

Prior to the start of a July 2008 adjudicatory hearing, the State informed the trial court that an agreement had been reached. Under the terms of the agreement, respondent admitted that she had unresolved drug-abuse and domestic-violence issues as alleged by the State. In exchange, the State (1) moved to continue its petition for adjudication of wardship and (2) recommended that respondent regain custody of A.L. subject to (a) supervision by the Department of Children and Family Services (DCFS) and (b) respondent's completion of specific requirements.

After confirming that (1) respondent's admission was knowing and voluntary and (2) a factual basis existed, the trial court accepted the agreement. Thereafter, the court entered an agreed order of continuance under supervision, which continued the State's petition for adjudication of wardship until July 2009. In addition, the court's order mandated that respondent (1) cooperate with DCFS to include compliance with client-service-plan goals; (2) keep DCFS informed of her current address; (3) undergo evaluations, complete counseling, and sign releases for information as DCFS requests; (4) submit to random drug tests as DCFS directs; (5) discontinue any contact with Logan until further notice; and (6) comply with mental-health,

- 2 -

substance-abuse, and domestic-violence counseling.

Following a September 2008 review hearing, the trial court found that respondent failed to comply with the court's agreed order of continuance under supervision, noting that despite respondent's compliance with counseling services and three negative drug tests, respondent admitted that she smoked cannabis once. After sternly admonishing respondent that continued drug use would result in removal of A.L. from her custody and the subsequent termination of her parental rights, the court determined that respondent should maintain custody of A.L.

In October 2008, the State filed a petition to revoke continuance under supervision, alleging that respondent violated the trial court's order by traveling in a car with Logan and failing to report that contact to her caseworker. At a November 5, 2008, hearing on the State's petition, respondent admitted that she failed to comply with the court's order. In response, the court entered an order that (1) granted the State's petition, (2) appointed DCFS as A.L.'s temporary guardian, and (3) scheduled a dispositional hearing.

On November 20, 2008, Susan Pierce, respondent's caseworker, filed a dispositional hearing report, noting that respondent (1) was complying with her counseling and client-service-plan goals, (2) tested negative on a random drug-screening test, and (3) maintained her visitation schedule with A.L.

The following day, the trial court conducted a dispositional hearing where Pierce testified consistent with her

- 3 -

report findings, which she stated were based on conversations she had with two of respondent's counselors.  Pierce recommended that A.L. return to respondent's care contingent upon her continued cooperation with services.  Prior to announcing its judgment, the court stated the following:

"And 15 days ago we were in this court-room, and [the court] heard *** evidence, unrebutted, about what had been going on.  *** [T]here was an admission to the Petition for Adjudication of Wardship.  But even since then [respondent was] absolutely ignoring the orders of the court ***.  ***  [Respondent] had used drugs, as well as broken the no-contact rule ***.  And yet 15 days later, all this has magically changed[?]  ***  [F]or that kind of dramatic turnaround in 15 days, [the court would] think [it would] have a *** piece of paper with somebody's signature on it *** explaining to [the court] exactly why [respondent was] able to make that dramatic of a change.  People's personalities and the problems they have with their behavior don't change in 15 days."

Thereafter the court entered a dispositional order, (1) adjudicating A.L. a ward of the court, (2) maintaining DCFS as her guardian, (3) granting respondent unsupervised, overnight visita-

tion on the weekends and one weekday, and (4) setting a permanency goal of "return home within 12 months."

At a January 2009 status review hearing, the trial court considered a status hearing report prepared by a DCFS contractor that showed respondent reported she was living with a "boyfriend," which prompted the following exchange:

"THE COURT: ***

You have somebody in your home *** living with you[? The court] couldn't get a straight read from the report, because [the court does not] think you were *** forthcoming with the [caseworker] about what that situation is, but you've got somebody in the home now who's a convicted felon, multiple times convicted of drug use, and this is a person that you think is appropriate to have in your home when [A.L.] is there?

[RESPONDENT]: Apparently not."

Following the hearing, the court entered an order, finding that respondent was not in compliance with its November 2008 dispositional order despite respondent's counseling participation and negative drug-screening test results. The court's order mandated that respondent refrain from having any contact with Logan, her boyfriend, or "any other member of the opposite sex." In addition, the court (1) eliminated respondent's overnight visitation with A.L. and (2) maintained the permanency goal of

- 5 -

return home within 12 months.

At a May 2009 permanency review hearing, the court considered evidence, contained in a permanency-review-hearing report prepared by respondent's caseworker, Frani Estes. Estes' report noted that in April 2009, respondent violated the court's November 2008 dispositional order by testing positive for tetra-hydrocannabinol (THC), a psychoactive substance in cannabis, and opiates. The court entered a permanency hearing order, finding that respondent failed to make reasonable progress toward A.L.'s return home within 12 months. The court's order mandated that (1) respondent's visitation schedule with A.L. be reduced to two hours of supervised visitation per week and (2) the current permanency goal of return home within 12 months remain unchanged. Later that same month, Estes rated respondent's overall progress on completing her client-service-plan goals as unsatisfactory because of respondent's drug relapse.

At an October 2009 permanency review hearing, which was continued to December 2009, the trial court considered the permanency-review-hearing report of respondent's new caseworker, Brandy Bradshaw, which was supported by Bradshaw's testimony. In particular, Bradshaw noted that respondent failed to (1) comply with drug and alcohol counseling in that she was not attending the number of weekly meetings prescribed and (2) provide the requested documentation confirming her attendance at those counseling sessions. Bradshaw confirmed that respondent's visitation with A.L. was "positive and full of activities[,]

dinners[,] and readings" but recommended that respondent's visitation remain supervised at two hours per week because she was not making sufficient progress in completing her substance-abuse, domestic-violence, and individual counseling.

Respondent testified that she was not attending her semiweekly drug and alcohol counseling sessions because "several" sessions were cancelled because fewer than three participants were present. Respondent also noted that following the October 2009 permanency review hearing, she began completing 75 hours of outpatient drug and alcohol treatment by attending weekly meet-ings. Respondent explained that she did not appear for a Novem-ber 2009 drug-screening test because she had car troubles and the driving conditions on that night were not good.

Respondent admitted that she (1) had failed to complete at least two drug-screening tests; (2) had been in contact with her former male roommate, whom she described as a friend; (3) entered a drug-treatment facility in April 2009 because she had been using heroin; and (4) had previously admitted that she found ways to register a negative result on drug-screening tests despite using illicit drugs.

Thereafter, the trial court entered a permanency hearing order, (1) finding that respondent failed to make reason-able progress toward A.L.'s return home within 12 months, (2) maintaining the permanency goal of return home within 12 months, and (3) scheduling a March 2010 permanency review hearing to consider DCFS' recommendations from its proposed legal screening

of respondent's case.

At the March 2010 hearing, the trial court considered a permanency-review-hearing report prepared by respondent's new caseworker, Julie Thompson, who testified consistent with her report. In particular, the report and testimony showed that respondent (1) was unemployed and did not have any transportation; (2) had not attended any substance-abuse or individual counseling sessions since the December 2009 permanency review hearing but had expressed a willingness to do so once her transportation problems were resolved; (3) admitted that she was using heroin "at least two times per day"; and (4) was not participating in drug screening because she knew the test results would be positive. During the hearing, the court ordered respondent to undergo a drug test. Shortly thereafter, the test result revealed that respondent tested positive for THC and opiates. Afterward, the court entered a permanency hearing order, changing the permanency goal to substitute care pending termination of respondent's parental rights.

In July 2010, the State filed a petition seeking to terminate the parental rights of respondent, alleging that she was an unfit parent in that she (1) failed to make reasonable progress toward the return of A.L. within nine months after the adjudication of neglect (November 21, 2008, through August 21, 2009) (750 ILCS 50/1(D)(m)(ii) (West 2008)) and (2) failed to make reasonable progress toward the return of A.L. during any nine-month period after the adjudication of neglect (750 ILCS

- 8 -

50/1(D)(m)(iii) (West 2008)), specifically the nine-month period from August 21, 2009, through May 21, 2010.

B. The Evidence Presented at Respondent's Fitness Hearing

1. *The State's Evidence*

A summary of the pertinent evidence presented by the State at respondent's fitness hearing showed the following.

Kari Blickhan, respondent's caseworker from November 2009 through January 2010, characterized the frequency of her interaction with respondent as "inconsistent." Blickhan met with respondent three times during her tenure, adding that respondent's "follow-through" was virtually nonexistent. Blickhan recounted how she scheduled respondent for approximately six drug-screening tests and received documentation that respondent (1) completed one test and (2) failed to appear for three tests. Respondent admitted to Blickhan that she was not complying with her drug-screening tests because "she knew she would be dirty." Blickhan acknowledged that during one conversation, respondent stated that she was "going through some struggles" to explain her missed drug-screening tests. However, Blickhan stated that respondent did not mention that she was having trouble getting to her appointments, mentioning instead that respondent stated that she had her own vehicle or could find transportation.

Thompson, who, in February 2010, became respondent's new caseworker, testified that in March 2010, she spoke with respondent about scheduling services for respondent, who had stopped making any progress on her client-service-plan goals.

When Thompson mentioned that respondent would be required to continue drug testing, respondent informed Thompson that she "was back to a twice-a-day usage and that there was no point, that she would be dirty." In May 2010, Thompson rated respondent's overall progress on completing her client-service-plan goals as unsatisfactory. Thompson based her rating on respondent's substance-abuse problems, which respondent admitted to Thompson were occurring during the six-month evaluation period.

Prior to the close of the State's case, the trial court complied with the State's request--which was proffered without objection--to take judicial notice of (1) its pertinent orders, (2) the permanency-review-hearing reports, and (3) respondent's client service plans.

2. *Respondent's Evidence*

Respondent testified (1) about her employment history from January 2009 through November 2009; (2) about her living arrangement, which she described consisted of residing in a mobile home that was owned by her mother; (3) that she transported herself to her drug-screening tests; (4) that she initiated her individual counseling sessions, which she paid for; and (5) that she asked her caseworkers for "other treatment" that they failed to provide. Respondent also admitted that from (1) January 2009 through April 2009; (2) August 2009 through December 2009; and (3) January 2010 through May 2010, she continued to use heroin and that she did not have any financial difficulties acquiring that particular drug.

- 10 -

3. *The Trial Court's Determination*

After considering the arguments of the respective parties, the following exchange occurred:

"THE COURT:  Counsel, can you all agree on what the date of adjudication was in this case?  Is it November of [20]08?

[THE STATE]:  Yes.  Once the Court supervision was revoked, that's the adjudication.

THE COURT:  There was actually an adjudication.  Do you disagree with that date[?]

[RESPONDENT'S COUNSEL]:  I believe that's accurate.

[GUARDIAN *AD LITEM*]:  I believe it is."

After considering the evidence and counsel's arguments, the trial court entered a written order, finding that respondent was unfit in that she (1) failed to make reasonable progress toward the return of A.L. within nine months after the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2008)) and (2) failed to make reasonable progress toward the return of A.L. during any nine-month period after the end of the initial nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(iii) (West 2008)).

### C. The Trial Court's Determination at the Best-Interest Hearing

At a best-interest hearing conducted immediately thereafter, the trial court considered evidence presented by the

- 11 -

State that A.L. (1) was placed in a single-family home with her paternal grandparents; (2) had bonded with her grandparents; and (3) was thriving in a loving environment in which her personal, health, and emotional needs were being met. Respondent's case-worker testified that respondent (1) moved to Missouri sometime after July 2010 and (2) had not expressed any interest in or asked any questions regarding A.L.'s welfare since her departure. The caseworker recommended that respondent's parental rights be terminated based on respondent's inability to correct the conditions that led to DCFS' involvement. (Respondent did not present any evidence at the best-interest hearing.)

After considering the evidence and counsel's arguments, the trial court terminated respondent's parental rights.

This appeal followed.

## II. THE TRIAL COURT'S FITNESS FINDING

Respondent argues that the trial court's fitness findings were against the manifest weight of the evidence. We disagree.

### A. The Applicable Statute, Reasonable Progress, and the Standard of Review

"Parental rights may be involuntarily terminated where (1) the State proves, by clear and convincing evidence, that a parent is unfit pursuant to grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2006)) and (2) the trial court finds that termination is in the child's best interests." *In re M.R.*, 393 Ill. App. 3d 609, 613, 912 N.E.2d 337, 341-42 (2009).

Section 1(D)(m)(iii) of the Adoption Act provides, in pertinent part, as follows:

"The grounds of unfitness are any *** of the following ***:

* * *

(m) Failure by a parent ***

(iii) to make reasonable progress toward the return of the child to the parent during any [nine]-month period after the end of the initial [nine]-month period following the adjudication of neglected or abused minor *** or dependent minor ***." 750 ILCS 50/1(D)(m)(iii) (West 2008).

In *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001), the supreme court discussed the following benchmark for measuring "reasonable progress" under section 1(D)(m) of the Adoption Act:

"[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other

- 13 -

conditions which later become known and which would prevent the court from returning custody of the child to the parent."

In *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991), this court discussed reasonable progress under section 1(D)(m) of the Adoption Act and held as follows:

"'Reasonable progress' *** exists when the [trial] court *** can conclude that *** the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent ***."  (Emphases in original.)

The supreme court's discussion in *C.N.* regarding the benchmark for measuring a respondent parent's progress did not alter or call into question this court's holding in *L.L.S.*  For cases citing the *L.L.S.* holding approvingly, see *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067, 859 N.E.2d 123, 137 (2006); *In re Jordan V.*, 347 Ill. App. 3d 1057, 1068, 808 N.E.2d 596, 605 (2004); *In re B.W.*, 309 Ill. App. 3d 493, 499, 721 N.E.2d 1202, 1207 (1999); and *In re K.P.*, 305 Ill. App. 3d 175, 180, 711 N.E.2d 478, 482 (1999).

"The State must prove parental unfitness by clear and

convincing evidence, and the trial court's findings must be given great deference because of its superior opportunity to observe the witnesses and evaluate their credibility." *Jordan V.*, 347 Ill. App. 3d at 1067, 808 N.E.2d at 604. A reviewing court will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record. *Jordan V.*, 347 Ill. App. 3d at 1067, 808 N.E.2d at 604.

### B. Respondent's Claim That the Trial Court's Fitness Finding Was Against the Manifest Weight of the Evidence

In her brief to this court, respondent essentially contends that the evidence presented at her fitness hearing showed that she had made reasonable progress toward the return of A.L. Specifically, respondent asserts, in part, that the evidence showed that from August 21, 2009, through May 21, 2010--the nine months that immediately followed the initial nine-month period--she received a satisfactory progress rating on the following client-service-plan goals: (1) cooperate in completing an alcohol/drug-use assessment, (2) ensure that respondent did not inflict physical punishment or allow such punishment to be inflicted upon A.L., (3) demonstrate parenting techniques when interacting with A.L., and (4) cooperate and comply with DCFS administrative requirements.

However, despite respondent's claims, the same client service plan that respondent relies on to tout her satisfactory ratings on specific client-service-plan goals was rated as unsatisfactory overall because respondent failed to show reason-

able progress on the following client-service-plan goals: (1) comply with drug-screening tests; (2) comply with drug-treatment, mental-health, and individual counseling recommendations; (3) stop use of all alcohol and nonprescribed medication; (4) demonstrate progress on substance-abuse issues by developing a relapse plan; and (5) comply with court orders regarding client-service-plan services.  In addition, the evidence presented at respondent's fitness hearing belies her argument that the trial court's fitness finding was against the manifest weight of the evidence.

In this case, the evidence showed that after the initial nine-month period following the neglect adjudication, which ended on August 20, 2009, respondent received an overall unsatisfactory evaluation on two separate client service plans spanning a time period from November 2009, when Bradshaw rated her overall progress as unsatisfactory, through May 2010, when Thompson rated respondent's progress as unsatisfactory--both based primarily upon respondent's continued failure to address her increasing illicit drug use.  Indeed, respondent readily admitted at her November 2010 fitness hearing that from August 2009 through May 2010, she continued to use heroin at least two times per day and that she did not have any financial difficulties acquiring that particular drug.

More important, the evidence did not show that respondent had fully complied with her specific client-service-plan goals during the relevant nine-month periods such that A.L. could have been placed in respondent's care in the *near future*.

Accordingly, reviewing the evidence pursuant to the applicable standard of review (as we are required to do), we conclude that the court's unfitness finding was not against the manifest weight of the evidence.

Because we have concluded that the trial court's finding that respondent failed to make reasonable progress toward the return of her child during any nine-month period after the end of the initial nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(iii) (West 2006)) was not contrary to the manifest weight of the evidence, we need not consider other findings of parental unfitness. See *In re Katrina R.*, 364 Ill. App. 3d 834, 842, 847 N.E.2d 586, 593 (2006) (on review, if sufficient evidence is shown to satisfy any one statutory ground, we need not consider other findings of parental unfitness).

### III. EPILOGUE

In *In re J.G.*, 298 Ill. App. 3d 617, 628-29, 699 N.E.2d 167, 175-76 (1998), this court rejected the State's argument that at a fitness hearing under the Adoption Act, a trial court can take judicial notice of the entire record preceding the parental-termination hearing without first finding that the contents of the court file were admissible under the civil rules of evidence. See *In re M.S.*, 239 Ill. App. 3d 938, 946, 606 N.E.2d 768, 773 (1992) (where this court concluded that the rules of evidence that normally apply to civil cases also apply to fitness hearings under the Adoption Act). The rationale for our decision in *J.G.*

concerned the severity of the sanction that could be imposed upon a parent at a fitness proceeding under the Adoption Act--namely, "the permanent and irrevocable loss of any rights to his or her child." *J.G.*, 298 Ill. App. 3d at 629, 699 N.E.2d at 175.

However, the same civil rules of evidence that we deemed applicable to fitness hearings under the Adoption Act do not apply at either dispositional hearings or permanency review hearings, which are governed, in part, by sections 2-22(1) and 2-28(2) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-22(1), 2-28(2) (West 2008)). In *J.G.*, we explained this difference in the rules of evidence as follows:

> "In the typical termination of rights case, the file has been open for at least a year and, frequently, much longer. During that period, the trial court will have con-ducted any number of review hearings and DCFS will have filed various service plans and reports with the court. These materials serve a vital function at the review hearings in assisting the court in determining whether a child may be returned home and the case closed, or whether the parent has failed to progress to the point where reunification is appropriate. These reports may contain hear-say. However, trial courts are allowed by statute at review hearings to consider all

evidence relevant to determining the questions of (1) appropriateness of the permanency goal, (2) appropriateness of the service plan to achieve this goal, (3) appropriateness of the services contained in the plan and whether those services have been provided, (4) whether reasonable efforts have been made by all parties to the service plan to achieve the goal, and (5) whether the plan and goal have been achieved.  705 ILCS 405/2-28(2) (West 1996).

At an unfitness hearing, the trial court must necessarily take notice of certain facts relating to how the case has reached the point at which termination of parental rights is sought by the State.  Thus, the court must know what steps the parent was supposed to have taken in order to achieve reunification with the child and when the clock began to run during which time the parent was required to take these steps.  However, wholesale judicial notice of everything that took place prior to the unfitness hearing is unnecessary and inappropriate.  The rules of evidence in civil cases apply to adjudicatory hearings under the Act (705 ILCS 405/2-18(1) (West

1996)), with a limited exception for hearsay, as contained in section 2-18(4)(a) of the Act (705 ILCS 405/2-18(4)(a) (West 1996))." *J.G.*, 298 Ill. App. 3d at 628-29, 699 N.E.2d at 175.

We note that section 2-22(1) of the Juvenile Court Act provides as follows:

"At the dispositional hearing, the court shall determine whether it is in the best interests of the minor and the public that he be made a ward of the court, and, if he is to be made a ward of the court, the court shall determine the proper disposition best serving the health, safety and interests of the minor and the public. The court also shall con- sider the permanency goal set for the minor, the nature of the service plan for the minor and the services delivered and to be deliv- ered under the plan. *All evidence helpful in determining these questions, including oral and written reports, may be admitted and may be relied upon to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing.*" (Em- phasis added.) 705 ILCS 405/2-22(1) (West 2008).

Similarly, section 2-28(2) provides that in selecting the permanency goal that is in the best interest of the child, a trial court shall consider the following:

> "The court shall consider (i) the permanency goal contained in the service plan, (ii) the appropriateness of the services contained in the plan and whether those services have been provided, (iii) whether reasonable efforts have been made by all the parties to the service plan to achieve the goal, and (iv) whether the plan and goal have been achieved. *All evidence relevant to determining these questions, including oral and written reports, may be admitted and may be relied on to the extent of their probative value*." (Emphasis added.) 705 ILCS 405/2-28(2) (West 2008).

In *J.G.*, 298 Ill. App. 3d at 629, 699 N.E.2d at 175-76, this court also stated the following regarding the proper procedure to employ when requesting that a trial court take judicial notice of evidence at a fitness hearing pursuant to the Adoption Act:

> "If the State wishes the trial court to take judicial notice of portions of the court file in a particular unfitness proceeding, the State can make a proffer to the court of

the material requested to be noticed.  De-
fense counsel should then be allowed an op-
portunity to object to the State's request.
Such a procedure would serve to focus the
trial court's attention on only those matters
that are admissible under the rules of evi-
dence, as well as make it easier for a re-
viewing court to determine what the trial
court actually relied on in making its deci-
sion of unfitness.  Above all, the trial
court's decision as to whether a parent is
unfit should be based only upon evidence
properly admitted at the unfitness hearing."

In *In re Ch.W.*, Nos. 4-09-0925, 4-10-0831 cons., slip op. at 14
(Ill. App. Mar. 10, 2011), this court recently reaffirmed the
above analysis and suggestions.

It is within this aforementioned context that we
provide the portion of the record in this case that occurred, as
we previously noted, immediately prior to the close of the
State's case, at which the parties had the following discussion
regarding the entry of the entire record preceding respondent's
November 2010 fitness hearing:

"[THE STATE]:  And [the State believes]
all that's left at this point is [the State
requests] the Court to take judicial notice
of the Court file in [this case] in regard[]

- 22 -

to the Court orders and permanency review reports, and client service plans that have previously been on file.

THE COURT: Any objections with that, Counsel?

[RESPONDENT'S COUNSEL]: No.

THE COURT: Then the Court will take judicial notice of its *** orders in [this case] and all permanency reports filed therein."

The prevailing theme of our discussions regarding the various proceedings under the Juvenile Court Act and Adoption Act is that when a party requests that the trial court take judicial notice of the prior record at a fitness hearing, the parties as well as the court must be clear as to the scope of the judicial notice requested. This required clarity is important given our aforementioned discussion regarding the different rules of evidence that apply--namely, no formal rules of evidence at a dispositional or permanency review hearing, yet those same rules of evidence are strictly enforced at fitness hearings.

The record in this case suggests that the State did not intend to tailor its judicial-notice request to narrow portions of the prior proceedings that would merely inform the trial court of the circumstances surrounding how the parties found themselves at a fitness hearing seeking to terminate respondent's parental rights. Instead, the record implies that the State was asking

the court to take judicial notice of the entire record of proceedings prior to the termination hearing and to give that prior record substantive effect. However, for the reasons stated in *J.G.*, the parties need to be explicit as to the scope of the judicial notice being requested, and the court must be explicit as to the scope of the judicial notice it is granting. Doing so would avoid the need for this court to speculate about what evidence the trial court considered in making its determination at the fitness hearing.

Here, we will infer, based on the record, that the State was asking for the trial court to take judicial notice of the entire record (various reports as well as testimony) preceding the parental-termination hearing and to give that record substantive effect. We further infer that respondent agreed to the scope of the judicial notice taken by the court.

We find support for our inference regarding respondent's acquiescence to the broad scope of the trial court's judicial notice based on the defense respondent chose to employ. At the November 2010 fitness hearing, respondent sought to call into question the written statements that her caseworkers made in support of their respective evaluations that she was not making reasonable progress in completing her client-service-plan goals. In particular, respondent sought to discredit Thompson's May 2010 overall unsatisfactory rating on respondent's client service plan by claiming that Thompson's evaluation was not based on her own personal knowledge but, instead, on prior contact, notes, and

discussions with the prior caseworker. Thus, respondent may have made the strategic decision to allow the trial court to take broad judicial notice of the client service plan, which was otherwise inadmissable as substantive evidence, to bolster her argument in that regard. Similarly, in her brief to this court, respondent relies on specific responses Bradshaw provided at an October 7, 2009, permanency review hearing to refute Bradshaw's claim in her permanency-review-hearing report--both of which would normally be inadmissible--that respondent was not complying with her client-service-plan goals.

In concluding, we note that even if the trial court had not taken judicial notice of the record preceding the parental-termination hearing, the remaining evidence presented at the November 2010 fitness hearing supported the court's determination. Nonetheless, we mention this matter because in future proceedings, we expect the court and parties to comply with *J.G.* See *In re A.B.*, 308 Ill. App. 3d 227, 239, 719 N.E.2d 348, 358 (1999) (where the Second District endorsed this court's analysis in *J.G.* and similarly suggested that the better practice is for a "trial court to require the State to make a proffer of the items of which it wished the court to take notice").

## IV. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

- 25 -