NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 210062-U

NOS. 4-21-0062, 4-21-0063, 4-21-0064 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 28, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.M., Ra. R., and Ro. R., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | Nos. 18JA91 |
| v. | ) | 18JA92 |
| Rashad R., | ) | 18JA93 |
| Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Knecht and Justice Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, holding the trial court did not err in finding
respondent an unfit person and terminating his parental rights.

¶ 2    In April 2018, the State filed a petition for adjudication of neglect or abuse with
respect to J.M., Ra. R., and Ro. R., the minor children of respondent, Rashad R. In July 2018, per
a stipulation from the parents, the trial court adjudicated the minors abused and neglected, made
them wards of the court, and placed custody and guardianship with the Department of Children
and Family Services (DCFS). The State filed a motion to terminate respondent's parental rights
in February 2020. Following a hearing on the State's motion in January 2021, the court found
respondent an "unfit person" within the meaning of section 1(D) of the Adoption Act (750 ILCS
50/1(D) (West 2018)). The court then found it was in the minors' best interests to terminate

respondent's parental rights.

¶ 3    In February 2021, respondent moved to consolidate the three cases into this one appeal, and we granted the motion. On appeal, respondent argues the trial court erred in terminating his parental rights; specifically, he alleges the trial court's unfitness finding stands against the manifest weight of the evidence. We affirm.

¶ 4                    I. BACKGROUND

¶ 5    On April 25, 2018, the State filed a petition for adjudication of abuse and neglect with respect to J.M. (born January 31, 2016), Ra. R. (born December 12, 2017), and Ro. R. (born December 12, 2017), alleging the minors had been physically abused as evidenced by the twins sustaining unexplained bilateral rib fractures. The State's petition further alleged respondent (Rashad R.) to be the children's father. After a shelter care hearing, pursuant to the stipulation of abuse and neglect and immediate and urgent necessity by the parents, the trial court placed temporary custody and guardianship of the children with DCFS.

¶ 6    In June 2018, DCFS established a caregiver service plan for Rashad R., setting the following goals: participate in visitation and bring snacks, formula, diapers, and other necessities for the children during visits; complete services in domestic violence education and demonstrate what he has learned; engage in individual counseling to address the underlying cause of why the children came into care; complete a substance abuse assessment; complete parenting classes and parent coaching and utilize the skills to parent appropriately; complete anger management; and complete mental health services.

¶ 7                    A. Adjudicatory Proceedings

¶ 8    On July 12, 2018, the parents stipulated J.M. was at substantial risk of physical abuse as evidenced by the physical abuse of her brothers. The parents likewise stipulated Ra. R.

and Ro. R. (the twins) had been physically abused. The trial court issued an adjudicatory order finding the minors abused and neglected. The court specifically noted the twins had been taken to the hospital for respiratory problems where testing showed they suffered multiple healing anterior and bilateral rib fractures. The parents provided no explanation for the injuries.

¶ 9        On August 23, 2019, the trial court issued a dispositional order finding Rashad R. unfit and unable to care for, protect, train, educate, supervise, or discipline the children and determining placement with him was contrary to the children's health, safety, and best interests because of his substance abuse and lack of parental involvement. The court granted the State's petition, adjudicated J.M., Ra. R., and Ro. R. abused and neglected, and made them wards of the court. The court ordered DCFS to maintain custody and guardianship over the children.

¶ 10        B. Termination of Respondent's Parental Rights

¶ 11        On February 27, 2020, the State filed a motion seeking a finding of unfitness and termination of the parental rights of Rashad R. The State alleged Rashad was an unfit person pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). The State's petition identified five grounds of unfitness as to Rashad: (1) he had failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) he had failed to make reasonable efforts to correct the conditions which were the basis for the removal of the minor from him within nine months after an adjudication of abuse, specifically July 12, 2018, to April 12, 2019 (750 ILCS 50/1(D)(m)(i) (West 2018)); (3) he had failed to make reasonable efforts to correct the conditions which were the basis for the removal of the minor from him within nine months after an adjudication of abuse, specifically April 12, 2019, to January 12, 2020 (750 ILCS 50/1(D)(m)(i) (West 2018)); (4) he had failed to make reasonable progress toward the return of the minor to the parent during

any nine-month period following adjudication of neglect, specifically the nine-month period between July 12, 2018, to April 12, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2018)); and (5) he had failed to make reasonable progress toward the return of the minor to the parent during any nine-month period following adjudication of neglect, specifically the nine-month period between April 12, 2019, to January 12, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2018)). The State further contended termination of Rashad R.'s parental rights was in the minors' best interests and asked for custody and guardianship to remain with DCFS, giving them the authority to consent to the minors' adoption.

¶ 12                                    C. Fitness

¶ 13        In January 2021, the trial court held a fitness hearing. Rashad R., who was in the custody of the Sangamon County Sheriff's Office, attended the hearing represented by counsel. To start the hearing, per a motion from the State, the trial court took "judicial notice of the Court file, including adjudication and Dispositional Orders as noted." The State called two witnesses. Kylie Jackson, the former caseworker assigned to the case, testified she worked on the case from July 2018 through March 2019. She confirmed the children came into care because the twins suffered broken ribs in multiple stages of healing. Jackson testified she created a service plan for Rashad, which included the following tasks: visitation, cooperation, counseling, anger management, domestic violence counseling, and substance abuse treatment. Jackson testified Rashad successfully completed anger management and was successfully discharged from that program. She stated Rashad R. had two negative drug drops and was rated satisfactory for drug screening. Jackson testified respondent did not complete domestic violence, counseling, or substance abuse services. Jackson testified Rashad R. participated in visitation with the children but she did not rate it as successful. Jackson explained Rashad had weekly supervised visits with

the children and attended 20 of 21 visits. She stated J.M. was two years old and the twins were between six months and one year old during the time respondent had visitation. Jackson testified Rashad came to visits unprepared, failing to bring diapers, wipes, formula, or any other necessities for the children. He had trouble handling all three children during visits. Rashad would leave one of the twins unattended on a changing table, even after being told by the caseworker, case aide, and parent educator not to leave the children on the table. He displayed frustration when the babies cried. Jackson testified she informed Rashad of J.M.'s dairy allergy and provided him with a list of appropriate foods for her; however, he continued bringing J.M. inappropriate foods. Jackson stated, "Rashad was very resistant *** with everything, services, speaking to me, his attitude. He was resistant." Jackson testified that during her time on the case, there was no point where she felt she could return the children to their father. She elaborated that Rashad failed to display appropriate parenting skills during the time she worked the case. She confirmed he had been incarcerated in the Sangamon County jail since December 2018.

¶ 14        The State next called Jennifer Power, the current caseworker, who previously worked on the case as a case aide. She stated she reviewed the entire case file. Power confirmed Rashad R.'s DCFS service plan required him to do the following: "cooperation, visitation, parenting, anger management, counseling, and substance abuse." She testified he successfully completed only anger management and did not complete the others. Power stated Rashad did not have visitation with the children during the time she was the assigned caseworker because of an order of protection issued to the children's mother. She testified she observed visits when she worked as a case aide. She explained Rashad left the babies unattended on the changing tables and rebuffed her attempts to redirect him. Power stated Rashad "told the boys to shut up when they were crying." Power explained Rashad R. did not always supervise the twins during visits

and they sometimes put inappropriate things from the floor in their mouths, which Power had to remove. Power testified Rashad failed to complete services while he was incarcerated because services could not be offered to him in the jail. Power stated there was never a time when she was close to returning the children back to their father. With that, the State rested.

¶ 15 Neither Rashad R. nor the guardian *ad litem* (GAL) presented any evidence, except Rashad's counsel asked the trial court "to take judicial notice of the Court dockets in both 18-OP-1346 [the order of protection against Rashad] and 18-CF-1299 [Rashad's criminal case for aggravated domestic battery]," which the court did.

¶ 16 In their closing statements, each side recapped evidence favorable to its position on whether Rashad met the definition of an "unfit person." The GAL, however, offered a succinct closing statement, saying: "I believe the State has met its burden as to all of the allegations in its petition."

¶ 17 The trial court rendered its decision on the record, reviewing why the children came into care. The trial court noted how Rashad R. "was resistant with everything." The court acknowledged Rashad's accomplishments, noting he "did go through anger management, appears to have went to parenting classes, had the parent coaching." But the trial court observed how, despite receiving services over time, "he never improved in his ability to parent," and he "had the same issues in December when he went to jail that [h]e started with in April." The trial court identified its "biggest concern" in the case as Rashad's visits with the children. The court reviewed the testimony outlining how Rashad disregarded J.M.'s dietary restrictions and left the twins unattended on a changing table. The trial court then stated: "What's most concerning, *** given how this case came into the system, that he is telling a six-month-old, seven, eight, nine, up to a year old, 'Shut up' when they are crying. That's how he responds to a child of that age

- 6 -

when they are crying is to say, 'Shut up.' " The trial court concluded: "I do find, I think most importantly, that [Rashad] did not maintain a reasonable degree of interest, concern or responsibility as to the minors' welfare, for each minor." The trial court then stated: "I will make the findings with regards to efforts and progress during those nine-months periods." The court ultimately found the State proved by clear and convincing evidence that Rashad R. was an "unfit person to have these children."

¶ 18                                 D. Best-Interests Hearing

¶ 19          After a brief recess, the trial court held the best-interests hearing. The State recalled current caseworker Jennifer Power as its lone witness. Power testified all three children, now ages three and five, are placed together in a traditional foster home. She stated the twins had been in the same foster home since coming into care in April 2018 and J.M. joined them there in June 2018. Powers testified the children were doing "very well" in their foster home. She noted the children's needs are being met and they are making progress there. Power testified the children shared a bond with their foster parents and they call them "Mommy [and] Daddy." She described the children's relationship with the foster parents' two biological children as "very close." Power testified the foster parents wanted to adopt the children. She stated she believed staying in their current placement served the children's best interests. Power voiced no concerns regarding the children's placement in the foster home.

¶ 20          Neither Rashad R. nor the GAL presented evidence at this hearing.

¶ 21          After the arguments of counsel and the GAL, the trial court indicated it had considered the statutory best-interest factors, expressly discussing the children's physical safety and welfare, the children's identity, the children's attachments, the children's continuity of affection, the children's need for permanence, and the preferences of the persons available to

care for the children. The trial court labeled the "children's need for permanence" as "the biggest factor for the Court." The court discussed how the foster home "is the only home the twins have ever known" and how J.M. had likewise spent "significant time in this home." The trial court ultimately concluded: "For all these reasons, considering all the factors, I do find well beyond a preponderance of the evidence that it is in each of these minor's best interest that the parental rights of [Rashad] be terminated." The trial court reduced its decisions to written orders and advised Rashad of his appellate rights.

¶ 22       This appeal followed.

¶ 23                                II. ANALYSIS

¶ 24       Rashad argues the trial court erroneously terminated his parental rights because the court's unfitness determination goes against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 25       The Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494, 777 N.E.2d 930, 940 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights. The State must first show the parent is an "unfit person," and then it must show terminating parental rights serves the best interests of the child. *D.F.*, 201 Ill. 2d at 494-95 (citing the Adoption Act (750 ILCS 50/1(D) (West 1998) and the Juvenile Court Act (705 ILCS 405/2-29(2) (West 1998)). Here, Rashad challenges the trial court's first-step decision only—the unfitness finding.

¶ 26       " 'The State must prove parental unfitness by clear and convincing evidence.' " *In re A.L.*, 409 Ill. App. 3d 492, 500, 949 N.E.2d 1123, 1129 (2011) (quoting *In re Jordan V.*,

- 8 -

347 Ill. App. 3d 1057, 1067, 808 N.E.2d 596, 604 (2004)). The Adoption Act provides several grounds on which a trial court may find a parent unfit, including: the parent's failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2018)); the parent's failure to make reasonable efforts to correct the conditions that were the basis for the removal of the minor from the parent during any nine-month period following the adjudication of neglect or abuse or dependency under the Juvenile Court Act (750 ILCS 50/1(D)(m)(i) (West 2018)); and the parent's failure to make reasonable progress toward the return of the child to the parent during any nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(ii) (West 2018)). Despite these various potential bases for unfitness, "sufficient evidence of one statutory ground *** [is] enough to support a [court's] finding that someone [is] an unfit person." (Internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83, 19 N.E.3d 227; see also *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064, 859 N.E.2d 123, 135 (2006) ("A finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act.") (citing *In re D.D.*, 196 Ill. 2d 405, 422, 752 N.E.2d 1112, 1122 (2001)).

¶ 27       This court pays " 'great deference' " to a trial court's fitness finding " 'because of [that court's] superior opportunity to observe the witnesses and evaluate their credibility.' " *A.L.*, 409 Ill. App. 3d at 500 (quoting *Jordan V.*, 347 Ill. App. 3d at 1067). We "will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record." *A.L.*, 409 Ill. App. 3d at 500. Since " '[e]ach case concerning parental unfitness is *sui generis*, requiring a close analysis of its individual facts' " (*In re Jacorey*, 2012 IL App (1st) 113427, ¶ 19, 980 N.E.2d 91 (quoting *Daphnie E.*, 368 Ill. App. 3d at 1064)), we now turn our attention to the facts of this case.

¶ 28        The State alleged Rashad R. was unfit based on several statutory grounds. Four of

the five counts cited Rashad's failure to make reasonable efforts or progress toward the return of

the child to the parent during any nine-month period following the adjudication of neglect or

abuse (750 ILCS 50/1(D)(m)(i) (West 2018)). The State identified two nine-month periods

during which Rashad failed to make reasonable efforts or progress: July 12, 2018, to April 12,

2019, and April 12, 2019, to January 12, 2020. The trial court found that Rashad R. failed to

make reasonable efforts or progress during any of those nine-month periods. The fifth count

alleged Rashad R. failed to maintain a reasonable degree of interest, concern, or responsibility

for the minors' welfare (750 ILCS 50/1(D)(b) (West 2018)). The trial court labeled this

allegation the most concerning and found the State proved each count by clear and convincing

evidence. Rashad R. now challenges those findings as against the manifest weight of the

evidence.

¶ 29        Rashad R. points to evidence showing his early accomplishments in treatment as

proof he made reasonable efforts and progress toward return of the children in 2018. He

acknowledges "there were bumps in the conducting of visitation[,] but [he] had completed anger

management, and was consistent in his visitation." Rashad contends his reasonable efforts in

anger management and visitation render the trial court's unfitness finding erroneous. We

disagree.

¶ 30        "Reasonable efforts relate to the goal of correcting the conditions that caused the

removal of the child from the parent [citation], and are judged by a subjective standard based on

the amount of effort that is reasonable for a particular person [citation]." *Daphnie E.*, 368 Ill.

App. 3d at 1066-67. Rashad's children came into care based on past physical abuse and

substantial risk of future abuse—the twins sustained multiple rib fractures in various healing

stages. Though the cause of the rib fractures remains unknown, the record confirms the twins sustained the injuries while in their father's care. Thus, correcting the conditions that caused the children to come into care required this particular father to exert reasonable efforts to ensure the children's safety and physical well-being. Although he completed anger management and consistently attended visits, his behavior at those visits speaks loudly about his efforts. The caseworkers testified he arrived unprepared for the visits and became frustrated when the twins cried, telling them to "shut up." He left the twins unattended on a changing table—endangering them physically. He did not always supervise the twins when they were on the floor, resulting in them picking up inappropriate objects and putting them in their mouths—physically endangering them. Rashad also disregarded J.M.'s dietary restrictions and gave her inappropriate foods, which made her physically ill. Finally, the caseworker described Rashad R. as "very resistant, even though he kept in contact, he was resistant with everything, services, speaking to me, his attitude. He was resistant." His resistance manifested during the visits when he rebuffed redirection from the caseworker, case aide, and parent educator. He was not receptive to their instructions about not leaving the twins unattended, nor was he receptive to instructions about J.M.'s diet. Based on this evidence, showing how this particular father acted in attempting to correct the conditions that led to his children being physically abused and removed from his care (*Daphnie E.*, 368 Ill. App. 3d at 1066-67), we cannot come to the opposite conclusion from the trial court's finding that he failed to exert reasonable efforts toward the children's return home. The trial court's conclusion, therefore, does not stand against the manifest weight of the evidence. See *A.L.*, 409 Ill. App. 3d at 500.

¶ 31　　　　As for Rashad R.'s reasonable progress argument, we have previously explained "reasonable progress is an objective standard," measuring whether "the progress being made by a

parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original and internal quotation marks omitted.) *F.P.*, 2014 IL App (4th) 140360, ¶ 88. Rashad R.'s early compliance with services between April and December 2018 was not of sufficient quality and would not have allowed the court to return the children to his custody in the near future. Indeed, both caseworkers testified that at no point did Rashad show sufficient progress to get his children back. He, therefore, did not make reasonable progress during the first nine-month period from July 2018 to April 2019.

¶ 32       Rashad R. likewise failed to make reasonable progress toward return of the children home during the second nine-month period from April 2019 to January 2020. The evidence shows that after his arrest, respondent completed no services—and made no progress— from December 2018 to January 2020. When a parent makes zero progress for more than a nine-month period, we cannot find his early progress in anger management or visitation sufficiently demonstrable to qualify as "reasonable progress" for later periods. See *F.P.*, 2014 IL App (4th) 140360, ¶ 88.

¶ 33       Rashad R. challenges the trial court's unfitness findings based on failure to make reasonable progress because he was incarcerated for all but a few months of this case. He acknowledges he neither received nor completed any services during his incarceration, but he reasons this actually helps his appellate cause because his lack of services resulted in a dearth of evidence the State could present to satisfy its burden of proving him unfit by clear and convincing evidence. In simpler terms, Rashad R. believes no services means no evidence available for the State to prove its case. He is mistaken. Parents who are incarcerated must still make reasonable progress toward return of their children—our law affords "no exception for

time spent in prison." *In re J.L.*, 236 Ill. 2d 329, 340, 924 N.E.2d 961, 967 (2010); see also *F.P.*, 2014 IL App (4th) 140360, ¶ 89 ("Time in prison is included in the nine-month period during which reasonable progress must be made."). Contrary to Rashad's argument, his incarceration, which prevented him from receiving and therefore completing services, is evidence of his failure to make reasonable progress. He cannot use incarceration as an excuse. The fact that Rashad R.'s personal circumstances prevented him from making reasonable progress is irrelevant to the objective reasonable-progress standard. See *F.P.*, 2014 IL App (4th) 140360, ¶ 89. Since the evidence confirms Rashad did not make reasonable progress during any nine-month period, we conclude the trial court's unfitness finding does not stand against the manifest weight of the evidence because the opposite finding (*i.e.*, fitness) is not readily apparent. See *A.L.*, 409 Ill. App. 3d at 500.

¶ 34                     III. CONCLUSION

¶ 35        For the reasons stated, we affirm the trial court's judgment.

¶ 36        Affirmed.