NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241226-U

NOS. 4-24-1226, 4-24-1227 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 18, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* S.M. and S.W., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | Nos.  21JA117 |
| v. | ) | 22JA153 |
| Kaylena M., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Harris and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed, finding the trial court's termination of respondent mother's parental rights was not against the manifest weight of the evidence.

¶ 2     In April 2024, the State filed petitions to terminate the parental rights of respondent, Kaylena M., as to her minor children S.W. (born September 2021) and S.M. (born July 2022). Following hearings on the State's petitions, the trial court found Kaylena to be an unfit parent under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) and determined it was in the minors' best interests to terminate her parental rights. We affirm.

¶ 3                                   I. BACKGROUND

¶ 4                                 A. Initial Proceedings

¶ 5                        1. *Sangamon County Case No. 21-JA-117*

¶ 6        In September 2021, the State filed a petition alleging S.W. was a dependent, pursuant to subsection 2-4(1)(b) of the Juvenile Court Act of 1987 (Juvenile Act) (705 ILCS 405/2-4(1)(b) (West 2020)), in that she was without proper care because of the physical or mental disability of Kaylena.

¶ 7        In March 2022, the trial court entered an adjudicatory order finding S.W. a dependent, and a dispositional report was filed later that same month. According to the report, nine days after S.W.'s birth, Kaylena brought S.W. to the hospital believing she "was suffering from shaken baby syndrome." S.W. appeared to be healthy. However, Kaylena stated "they could not return home because someone was trying to poison all of them," which raised concerns over Kaylena's "untreated mental illness" and her "ability to safely parent a vulnerable infant." The court then entered a dispositional order and (1) found Kaylena unable to care for, protect, train, educate, supervise, or discipline S.W.; (2) made S.W. a ward of the court; and (3) placed her custody and guardianship with the Illinois Department of Children and Family Services (DCFS).

¶ 8                        2. *Sangamon County Case No. 22-JA-153*

¶ 9        In August 2022, the State filed a petition alleging S.M. was a neglected minor whose environment was injurious to his welfare under section 2-3(1)(b) of the Juvenile Act (705 ILCS 405/2-3(1)(b) (West 2022)) "as evidenced by [S.W.] being adjudicated neglected, [Kaylena's] failure to make reasonable progress towards having [S.W.] returned home, and [S.W.] remaining in the care of DCFS." The trial court entered an adjudicatory order that same

month and found S.M. resided in an environment injurious to his welfare. A dispositional order entered thereafter found Kaylena unfit to care for, protect, train, educate, supervise, or discipline S.M. The court adjudged S.M. neglected, made him a ward of the court, and placed custody and guardianship with DCFS.

¶ 10                                B. Termination Proceedings

¶ 11          In April 2024, the State filed petitions to terminate Kaylena's parental rights to S.W. and S.M. In relevant part, the petitions alleged Kaylena was an unfit parent within the meaning of section 1(D) of the Adoption Act because she (1) failed to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) failed to make reasonable efforts to correct the conditions that brought the minors into the care of DCFS (750 ILCS 50/1(D)(m)(i) (West 2022)); and (3) failed to make reasonable progress toward the return of the minors within nine months after the adjudication of neglect or dependence (750 ILCS 50/1(D)(m)(ii) (West 2022)).

¶ 12                                1. *Unfitness Hearing*

¶ 13          Kaylena failed to appear for the August 2024 unfitness hearing. Danielle Croll, a caseworker for Family Service Center, outlined Kaylena's services related to cooperation, mental health, psychological assessments, visitation, and parenting. Croll testified she had difficulty communicating with Kaylena throughout her involvement in the case. Croll explained, "A lot [of] times she just won't speak with you face-to-face. She does a lot of texting. But a lot of her communication went through her mother," Jacqueline M., who had "been a support for Kaylena [for] a majority of the case." Jacqueline had also been granted guardianship of Kaylena due to her mental incapacity, and as of the date of the unfitness hearing, Kaylena had never lived independently. However, Croll testified S.W. and S.M. were not placed in Jacqueline's care due

- 3 -

to concerns over her own stability, substance abuse, and mental health. According to Croll, Jacqueline "was kind of part of the hospital incident where [S.W.] was brought there. She was making comments about her family had been poisoned and people were trying to kill her." A written psychological assessment report indicated Jacqueline tested positive for methamphetamine and cocaine during prior "psychiatric mental health inpatient stays" and she had "multiple psychiatric hospitalizations for psychotic behavior, and diagnoses of anxiety, depression, bipolar disorder, and potentially schizophrenia."

¶ 14 Croll testified Kaylena missed "maybe three" of the 197 scheduled visits with the children. But Kaylena's "okay" performance in completing parenting coaching services "reiterated that she wouldn't be able to parent independently." She also failed to engage in counseling services. During visits, Kaylena needed assistance with "juggling both children" and attending to their basic needs. Croll explained Kaylena was unable to feed the minors independently and "changing their diapers was sometimes an issue." At no point did Kaylena's visits with the children become unsupervised.

¶ 15 Christopher Van Ham, a "postdoctoral supervised psychologist for Christian Psychological Associates," testified he conducted Kaylena's psychological evaluation in March 2023. Prior to her appointment with Van Ham, Kaylena completed two scientifically recognized standardized assessments which, Van Ham testified, showed "adaptive functioning concerns across all environments" and "symptoms of autism spectrum disorder" of "moderate severity." However, Van Ham was unable to assess Kaylena's cognitive functioning, academic achievement, and the impact of potential past trauma on her life during their appointment because she did not speak to, make eye contact with, or otherwise interact with him. He further explained the results of another "computerized personality measure" were "interpreted with

caution" because the questions were read to Kaylena in the presence of Jacqueline and Kaylena answered the questions nonverbally through hand gestures, facial expressions, and head nods. Ultimately, Van Ham stopped Kaylena's evaluation after she "gave her mother a glimpse of a knife that she had in her pocket," indicating "she was ready to be done."

¶ 16    In making its unfitness determination, the trial court noted Kaylena's inability to speak to or make eye contact with Van Ham during his evaluation of her. Although Kaylena visited the children almost 200 times, the court noted Kaylena still needed prompting from either Jacqueline or a case worker on what to feed the children, how to feed them, and how to change a diaper. The court also observed that, "[d]espite the parent coaching that she had, she never increased in her ability to parent these children even in the most basic level even at a supervised visitation." And even though Jacqueline had been granted guardianship of Kaylena, the court pointed out "the agency was never able to show that between the two of them that that was a sufficient prospect for returning these children to that care." Ultimately, the court found Kaylena unfit, noting she failed to maintain a reasonable degree of responsibility as to the minors' welfare because "she was unable to obviously provide care for herself given the adult guardianship." And although the court recognized efforts were made, it found Kaylena "failed to make reasonable progress towards the return of either child to her" during any nine-month period.

¶ 17                    2. *Best Interests Hearing*

¶ 18    At the best interests hearing, Croll testified S.W. and S.M. had resided with their current foster family for "their whole entire life [*sic*]." The children's foster parents ensured their medical, mental, and emotional needs were met. They provided for the children's food, shelter, clothing, and safety. They also made sure S.M. attended weekly developmental, speech, and physical therapy appointments. Croll testified the minors had "a really good bond" with their

foster parents and considered them to be their parents. The children felt loved, were well cared for, and appeared to be "doing very well" in their current placement. They each had their own bedroom, and the foster family had "a whole basement full of *** toys and things for the kids." According to Croll, the foster parents expressed their desire to adopt S.W. and S.M.

¶ 19    Ultimately, in "[l]ooking at all the best interest factors," the trial court found it was in the best interests of S.W. and S.M. to terminate Kaylena's parental rights.

¶ 20    This appeal followed.

¶ 21                                II. ANALYSIS

¶ 22    On appeal, Kaylena contends the trial court's unfitness and best interests findings were against the manifest weight of the evidence.

¶ 23                            A. Unfitness Finding

¶ 24    " 'The State must prove parental unfitness by clear and convincing evidence.' " *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011) (quoting *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067 (2004)). A determination of parental unfitness involves factual findings and credibility determinations which the trial court is in the best position to make because its "opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21. "A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence." *In re Ta T.*, 2021 IL App (4th) 200658, ¶ 48. "A trial court's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *In re N.B.*, 2019 IL App (2d) 180797, ¶ 30.

¶ 25    The Adoption Act provides several grounds on which a trial court may find a parent unfit. "[S]ufficient evidence of one statutory ground *** [is] enough to support a [court's]

finding that someone [is] an unfit person." (Internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83. In the present case, the trial court found Kaylena was an unfit parent as defined in section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)). Section 1(D)(m)(ii) provides, in part, a parent will be considered an "unfit person" if he or she fails "to make reasonable progress toward the return of the child to the parent during any [nine]-month period following the adjudication of [neglect] *** or dependent." 750 ILCS 50/1(D)(m)(ii) (West 2022). Reasonable progress exists when the evidence shows "the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). A parent does not demonstrate reasonable progress toward the goal of reunification with her children if she does not implement the skills taught to her through her services. See *In re R.L.*, 352 Ill. App. 3d 985, 999, (2004).

¶ 26        Here, the evidence established Kaylena was unable to implement the skills she learned to safely and appropriately parent the minors. Despite completing parenting coaching services and participating in almost 200 supervised visits, Croll testified Kaylena "wouldn't be able to parent independently." Kaylena exhibited significant difficulties with "juggling both children" and attending to their basic needs. She was unable to feed the children or change their diapers without assistance. And while the trial court believed Kaylena made efforts, there was not much in the way of improvement in her abilities. As the court observed, Kaylena "was unable to obviously provide care for herself given the adult guardianship," and "she never increased in her ability to parent these children even in the most basic level even at a supervised visitation." Further, Kaylena displayed "symptoms of autism spectrum disorder" of "moderate

severity," and a psychological assessment indicated "adaptive functioning concerns across all environments." Yet, Kaylena failed to engage in counseling services. In fact, Van Ham was unable to assess Kaylena's cognitive functioning, academic achievement, and the impact of potential past trauma on her life during their scheduled appointment because she did not speak to, make eye contact with, or otherwise interact with him. Kaylena eventually indicated that "she was ready to be done" by giving "her mother a glimpse of a knife that she had in her pocket," which prompted Van Ham to end the appointment.

¶ 27    Since the evidence confirms Kaylena failed to make reasonable progress during any nine-month period, we cannot say the trial court's unfitness finding stands against the manifest weight of the evidence because the opposite finding (*i.e.*, fitness) is not readily apparent. See *N.B.*, 2019 IL App (2d) 180797, ¶ 30.

¶ 28                              B. Best Interests Finding

¶ 29    After a parent is found unfit, "the focus shifts to the child." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The issue ceases to be "whether parental rights can be terminated" and becomes "whether, in light of the child's needs, parental rights should be terminated." (Emphases omitted.) *D.T.*, 212 Ill. 2d at 364. The trial court will consider the factors set forth in section 1-3(4.05) of the Juvenile Act (705 ILCS 405/1-3(4.05) (West 2022)). See *In re T.A.*, 359 Ill. App. 3d 953, 959-60 (2005). Those factors include: the child's physical safety and welfare; the development of the child's identity; the child's familial, cultural, and religious background and ties; the child's sense of attachments, including where the child feels loved, attached, and valued; the child's sense of security, familiarity, and continuity of affection; the child's wishes and long-term goals; the child's community ties; the child's need for permanence; and the uniqueness of every family and each child. 705 ILCS 405/1-3(4.05) (West 2022). We will not overturn a

court's best interests finding unless it is against the manifest weight of the evidence. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009).

¶ 30    Here, the evidence shows the best interests factors support the termination of Kaylena's parental rights. The children's foster parents were committed to adoption, and they ensured the minors' medical, mental, and emotional needs were met. They provided for the children's food, shelter, clothing, and safety. They also made sure S.M. attended weekly developmental, speech, and physical therapy appointments. Croll testified the minors' current foster family had cared for them "their whole entire life [*sic*]." The children had "a really good bond" with their foster parents and considered them to be their parents. The children felt loved, were well cared for, and appeared to be "doing very well" in their current placement. Each child had their own bedroom. When weighed against a legitimate concern for permanency for children of tender years, the trial court's finding termination was in the minors' best interests is not against the manifest weight of the evidence. See *T.A.*, 359 Ill. App. 3d at 960.

¶ 31    All told, the record shows S.W. and S.M. feel loved, valued, secure, and nurtured in their current placement and have structure and continuity, and it supports the trial court's decision. Thus, we cannot say the court erred in finding it was in the children's best interest to terminate Kaylena's parental rights.

¶ 32                                        III. CONCLUSION

¶ 33    For the reasons stated, we affirm the trial court's judgment.

¶ 34    Affirmed.