NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210722-U

NO. 4-21-0722

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 2, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.F., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 20JA104 |
| v. | ) | |
| April F., | ) | Honorable |
| | ) | Dwayne A. Gab, |
| Respondent-Appellant). | ) | Judge Presiding. |
| | ) | |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Knecht and Justice Steigmann concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed, holding the trial court did not err in terminating
respondent's parental rights.

¶ 2     In April 2020, the State filed a petition for adjudication of neglect or abuse with

respect to L.F., the minor child of respondent, April F. (Mother). In July 2020, following an

admission from Mother, the trial court adjudicated the minor neglected, and a month later, it

made him a ward of the court and placed custody and guardianship with the Illinois Department

of Children and Family Services (DCFS). The State filed a motion to terminate parental rights in

June 2021. Following a hearing on the State's motion in December 2021, the court found Mother

an "unfit person" within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D)

(West 2020)). The court then held a best-interests hearing the same day, where the court found it

was in the minor's best interests to terminate parental rights.

¶ 3        On appeal, Mother argues the trial court erred in terminating her parental rights; specifically, she alleges the trial court's unfitness findings and best-interests determination stand against the manifest weight of the evidence. We affirm.

¶ 4                        I. BACKGROUND

¶ 5        On April 27, 2020, the State filed a petition for adjudication of neglect with respect to L.F.—a minor child born to Mother on August 9, 2013—alleging two claims: (1) L.F. was "not receiving the proper care and supervision necessary for his wellbeing" because Mother "failed to make a proper care plan," and (2) L.F.'s "environment is injurious to his welfare, as evidenced by [M]other's drug use." The same day, after a shelter care hearing, the trial court found probable cause to believe L.F. was neglected and determined Mother's drug use (cocaine and methamphetamine) and mental illness (bipolar disorder) made it an "immediate and urgent necessity" to remove L.F. from Mother's home. The trial court then issued an order placing temporary custody and guardianship of L.F. with DCFS.

¶ 6        In May 2020, DCFS established a family service plan setting the following goals for Mother: cooperate with DCFS, necessary evaluations/assessments, and all court orders; maintain legal means of income; obtain stable housing; cooperate and fully participate in all parenting classes to completion; attend a substance abuse assessment and cooperate with recommendations made by service providers; participate in random drug screens and test negative for all substances and alcohol; fully cooperate and participate in all domestic violence classes offered until completion; refrain from becoming involved in a violent domestic relationship; consistently attend and appropriately participate in visitation with L.F.; and complete a mental health assessment and cooperate with recommendations by service providers.

¶ 7                    A. Adjudicatory Proceedings

¶ 8        On July 30, 2020, Mother admitted the petition's first allegation—she failed to make a proper care plan to ensure L.F.'s safety and well-being—in exchange for the State dismissing the second allegation. As a factual basis, the State noted DCFS received a hotline report regarding Mother and L.F. on or about April 25, 2020. Mother admitted to DCFS "that people involved in dangerous criminal activity were coming after her." L.F. told DCFS "he was aware of criminal activity and" feared " 'bad guys' " who "were around him and his mother." Once ensuring Mother knew and understood her rights and the juvenile court process, the trial court accepted Mother's admission. The trial court issued an adjudicatory order, finding "that the minor is neglected as alleged in paragraph #1" based upon Mother's admission.

¶ 9        The trial court also issued a dispositional order on August 27, 2020, finding (1) Mother unfit, unable, and unwilling to care for, protect, train, educate, supervise, or discipline L.F. and (2) determining placement with her is contrary to L.F.'s health, safety, and best interests. The court made L.F. a ward of the court and ordered DCFS to maintain custody and guardianship over him. The trial court's order further noted, amongst other services, "Mother must cooperate with substance abuse treatment, parenting, counseling," cooperate with DCFS, and comply with the service plan.

¶ 10              B. Termination of Respondent's Parental Rights

¶ 11        On June 22, 2021, the State filed a motion seeking a finding of unfitness and termination of parental rights of Mother. The State alleged Mother was an unfit person pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). The State's petition identified three counts: (1) Mother has failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) Mother has failed to make reasonable efforts to correct the conditions that were the basis for

the removal of the minor from her within nine months of the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2020)); and (3) Mother has failed to make reasonable progress toward the return of the minor to her during any nine-month period following adjudication of neglect, specifically the nine-month period between July 30, 2020, and April 30, 2021 (750 ILCS 50/1(D)(m)(ii) (West 2020)). The State further contended termination of Mother's parental rights was in L.F.'s best interests and asked for custody and guardianship to remain with DCFS, giving it the authority to consent to L.F.'s adoption.

¶ 12 In December 2021, the trial court held a fitness hearing. Before presenting new evidence, the State asked the trial court to take judicial notice of the following: the abuse and neglect petition, the adjudication and dispositional orders, and all prior permanency orders. It also, without objection, moved to admit two exhibits—service plans dated October 2020 and July 2021. The State then called one witness, Alyssa Williams, the caseworker assigned to L.F.'s case. She confirmed she had been L.F.'s caseworker since the case began in April 2020 when L.F. was taken into care due to Mother's mental illness and substance abuse. Williams testified she referred Mother to the following services, per the May 2020 family service plan: domestic violence counseling, substance abuse assessment, drug testing, and a mental health assessment. Williams noted the plan also required Mother to maintain stable housing and income.

¶ 13 Williams testified Mother attended the mental health assessment but did not successfully complete mental health treatment or counseling. She likewise noted Mother did not successfully complete domestic violence counseling or substance abuse treatment or provide proof of stable income. Williams recalled Mother had been referred for substance abuse treatment, specifically Gateway's partial hospitalization program (PHP), but Mother refused to participate in PHP. Williams testified Mother often tested positive for methamphetamine and she

eventually stopped attending drug screens in December 2020 because she believed her samples were being altered.

¶ 14    Williams noted Mother routinely participated in visitation with L.F. Sometimes she cried during visits, which upset L.F. When Williams asked Mother to stop crying during visits, she would change her behavior briefly but then revert back to crying during visits. Williams recounted one visit in March 2021 where Mother began discussing this case in L.F.'s presence. While Mother kept talking, L.F. appeared upset as he sat in the corner and put his fingers in his ears. When staff asked her to stop talking, Mother refused. She cursed, threatened staff, and escalated her behavior. L.F. had to be removed from the room and escorted from the building through the back door. Williams called the police, who arrived to defuse the situation.

¶ 15    Williams testified Mother did not successfully complete any service between July 2020 and May 2021. She said she never felt comfortable returning L.F. to Mother's care during this time period because Mother still tested positive for methamphetamine, she had untreated mental illness, she had made threats to people involved in the case, and she did not complete services.

¶ 16    On cross-examination from Mother's counsel, Williams acknowledged Mother did complete two mental health assessments and attended some counseling sessions through January 2021. She further noted Mother attended domestic violence classes and parenting classes. Mother attended some drug screens and maintained housing. Williams recognized Mother's visits with L.F. went well until the March 2021 incident.

¶ 17    On cross-examination by the guardian *ad litem* (GAL), Williams reiterated Mother was never able to successfully complete any of the outpatient programs she began. Williams again noted Mother refused drug screens after December 2020 because she believed

- 5 -

DCFS was altering the samples so she tested positive for drugs.

¶ 18    Mother testified in support of her case and confirmed she understood what the family service plan required her to do. She stated she had been employed before the COVID-19 pandemic. Mother attended all but one domestic violence class, the final class. She explained she missed this class because she was grieving her sister's death and looking for a job. She confirmed she attended counseling for her drug addiction at Gateway for a month until her counselor left. She claimed she called Gateway several times to get in to see another counselor but she never received a call back. Once dropped from Gateway, Mother went to Family Guidance Center for an evaluation, but she never engaged in counseling there because she never received the results from her first mouth swab. Mother also acknowledged she was not allowed back at Family Guidance Center following a documented incident when she took keys from the center and did not return them right away.

¶ 19    According to Mother, she "missed a couple" drug tests. She refuted Williams's claim that she believed DCFS was altering her drug tests. She claimed she simply asked DCFS to test her samples further because she took over-the-counter allergy and sleep medications. She explained she refused PHP because it was an 8 a.m.-to-4 p.m., Monday-through-Friday program, which would have prevented her from working. Mother reiterated she participated in two mental health assessments and briefly participated in counseling for her bipolar disorder.

¶ 20    Mother explained she thought she had good, quality visits with L.F. She admitted crying during a few visits. Regarding the March 2021 visit, she testified she thought the visit was going well until staff made certain comments to her. She could not recall what exactly happened or what was said. She stated she became upset and started crying when staff told her the visit would need to end. Mother did recall bringing up her drug tests and asking for proof of her drug

tests during the March 2021 visit.

¶ 21        On cross-examination by the State, Mother denied she previously admitted using cocaine and methamphetamine in April 2020, though she did acknowledge she tested positive for methamphetamine in June and July 2020. When the GAL questioned Mother on her December 2020 psychological evaluation, Mother testified she "did not agree with half of the stuff that was on there. *** [T]here was a lot of stuff on there I did not agree with." Mother noted she "butted heads" with Williams during the case, partly because Williams kept telling Mother to get clean and sober and Mother said she was clean and sober.

¶ 22        In its closing statement, the State argued Mother had not addressed the reasons L.F. came into care, namely her mental illness and substance abuse. Referencing exhibits, the State noted the Mother previously admitted using drugs in April 2020 and, at the time L.F. was taken into protective custody, Mother's "behavior was extremely erratic consistent with somebody under the influence or suffering from extreme mental health issues." Yet, the State pointed out Mother did not adequately address her drug use or mental health and Mother "consistently displayed erratic behavior around [L.F.]" The State recounted how the evidence showed Mother did not successfully complete any required services. She refused drug screens and did not obtain stable employment. The State closed by reiterating Mother "has not addressed any of the issues for which the case came into care and has not proven to be a stable placement." It asked the trial court to find it proved all unfitness allegations.

¶ 23        In arguing against Mother's unfitness, her counsel pointed the court's attention to how Mother nearly completed some services, noting she attended 11 of 12 domestic violence classes and 5 or 6 parenting classes. Counsel noted Mother maintained stable housing since 2020. Counsel also noted Mother acknowledged her mental illness and drug use and began

services to address those issues. Counsel explained Mother sometimes became upset and cried during visits with L.F. but only because she missed seeing her son daily. Counsel argued Mother "loves her child, she does have a great degree of interest in her child, she wants her child back, and she believes that she has made reasonable progress and reasonable efforts to correct the conditions which were the basis for removal in this case."

¶ 24 The GAL argued,"[t]here's no doubt [Mother] does love her child, but agency testimony as well as the parenting capacity noted there would be a very high risk to [L.F.] or to any child that was left supervised in her care." The GAL argued Mother did not adequately address her mental health and substance abuse, especially during the nine-month period alleged in the motion. The GAL contended the State proved all three unfitness allegations by clear and convincing evidence.

¶ 25 The trial court rendered its decision on the record, expressing "major concerns relating" to Mother's mental health and drug usage. The trial court noted Mother "had ample opportunities *** to make reasonable efforts towards completing [service] goals, that she steadfastly was unable to do these things and did refuse treatment and/or was unsuccessfully terminated from treatment." The trial court found "of particular interest" that Mother required PHP and refused to participate. The trial court determined Mother understood she had a drug abuse problem and mental health diagnoses and understood she needed treatment for both; however, she "failed to follow through on any *** treatment goal though offered on multiple occasions." The trial court noted Mother's "general failure to complete the other terms and conditions of the service plan" and went on to conclude: "those [services] were necessary, and they weren't done, so those are the bases for the order *** entered in regards to unfitness." The trial court ultimately found Mother unfit on all three grounds: (1) she failed to maintain a

reasonable degree of responsibility as to L.F.'s welfare, though she did maintain interest and concern; (2) she failed to make reasonable efforts to correct the conditions which were the basis for removal of L.F. from her care within nine months after the adjudication of neglect; and (3) she failed to make a reasonable degree of progress toward L.F.'s return to her care during a nine-month period following the adjudication of neglect, namely July 30, 2020, through April 30, 2021. The court ordered that L.F. remain a neglected minor and ward of the court.

¶ 26                                  C. Best-Interests Hearing

¶ 27          The trial court held the best-interests hearing later that afternoon. The State again asked the trial court to take judicial notice of the prior testimony as well as all prior permanency, adjudicatory, dispositional, and unfitness orders. The State then called caseworker Alyssa Williams as its lone witness. Williams testified L.F. had been placed with a "close family friend" since September 11, 2020, which she considered a fictive kin placement. As for L.F.'s needs for food, shelter, health, and clothing, Williams noted the foster parents met L.F.'s needs and made sure he received medical care. The foster parents helped develop L.F.'s identity by enrolling him in activities like swimming and basketball. Likewise, the foster parents helped keep L.F. in touch with his background, culture, and familial ties by taking him to family reunions and allowing him to visit with his siblings placed in Missouri. Williams testified L.F.'s foster parents encouraged his community ties through school, day care, and social events like birthday parties with his peers. Williams labeled L.F.'s need for permanency "urgent." She testified L.F. and his foster parents "have bonded really good," and L.F. "calls them mom and dad." Williams noted L.F. told her he wants to remain with his foster parents and would like for them to adopt him. Williams further noted the foster parents are willing to adopt L.F. Neither Mother's counsel nor the GAL inquired of Williams concerning L.F.'s best interests.

¶ 28 Next, Mother's counsel again called her to testify. She stated she took care of L.F. for the first six and a half years of his life—from the day he was born until the day he was removed from her care. She provided all of his needs for shelter, food, and medical care. Mother recalled she and L.F. did a lot of activities together like scavenger hunts, soccer, baseball, playing in the park, freeze tag, and board games. She believed she and L.F. were "really close" before April 2020 and he was never afraid of her. Mother testified the best place for L.F. to live is with her because "[h]e's my son, and I had him—almost died having my child." Neither the State nor the GAL asked Mother any questions.

¶ 29 After the arguments of counsel, the trial court issued its best-interests ruling, finding, by a preponderance of the evidence, L.F.'s foster parents provide him with a "stable and loving environment." They meet all of his needs and ensure L.F. has "awareness of his past and his family history," which "is something very needful for [the] child." The trial court noted the foster parents were "ready to adopt" and provide L.F. with stability and permanency. The court then concluded that, "for the foreseeable future," Mother could not provide L.F. with a stable environment or meet his needs. The court, therefore, concluded it served L.F.'s best interests to terminate Mother's parental rights.

¶ 30 This appeal followed.

¶ 31 II. ANALYSIS

¶ 32 Mother argues the trial court erroneously terminated her parental rights because the court's unfitness and best-interests determinations go against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 33 The Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2020)) govern how the State

may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494, 777 N.E.2d 930, 940 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights—the State must first show the parent is an "unfit person" and then the State must show terminating parental rights serves the best interests of the child. *D.F.*, 201 Ill. 2d at 494-95 (citing the Adoption Act (750 ILCS 50/1(D) (West 1998)) and the Juvenile Court Act (705 ILCS 405/2-29(2) (West 1998))). Here, Mother challenges the trial court's determinations at each of these steps. We take her challenges in turn.

¶ 34                              A. Unfitness Finding

¶ 35            " 'The State must prove parental unfitness by clear and convincing evidence ***.' " *In re A.L.*, 409 Ill. App. 3d 492, 500, 949 N.E.2d 1123, 1129 (2011) (quoting *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067, 808 N.E.2d 596, 604 (2004)). The Adoption Act provides several grounds on which a trial court may find a parent "unfit," including: the parent's failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2020)); the parent's failure to make reasonable efforts to correct the conditions that were the basis for the removal of the minor from the parent during any nine-month period following the adjudication of neglect or abuse or dependency under the Juvenile Court Act (750 ILCS 50/1(D)(m)(i) (West 2020)); and the parent's failure to make reasonable progress toward the return of the child to the parent during any nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(ii) (West 2020)). Despite several potential bases for unfitness, "sufficient evidence of one statutory ground *** [is] enough to support a [court's] finding that someone [is] an unfit person." (Internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83, 19 N.E.3d 227; see also *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064, 859 N.E.2d 123, 135 (2006) ("A finding of unfitness will stand if

supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act.") (citing *In re D.D.*, 196 Ill. 2d 405, 422, 752 N.E.2d 1112, 1122 (2001)).

¶ 36        This court pays " 'great deference' " to a trial court's fitness finding " 'because of [that court's] superior opportunity to observe the witnesses and evaluate their credibility.' " *A.L.*, 409 Ill. App. 3d at 500 (quoting *Jordan V.*, 347 Ill. App. 3d at 1067). We "will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record." *A.L.*, 409 Ill. App. 3d at 500. Since " '[e]ach case concerning parental unfitness is *sui generis*, requiring a close analysis of its individual facts' " (*In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19, 980 N.E.2d 91 (quoting *Daphnie E.*, 368 Ill. App. 3d at 1064)), we now turn our attention to the facts of this case.

¶ 37        The State alleged Mother was unfit based on several statutory grounds. One count cited Mother's failure to make reasonable progress toward the return of L.F. to her care during any nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(ii) (West 2020)), specifically, July 30, 2020, through April 30, 2021. The trial court found Mother failed to make reasonable progress during the alleged nine-month period, and she now challenges that finding as against the manifest weight of the evidence.

¶ 38        During the nine-month period from July 2020 to April 2021, Mother made unreasonable progress and successfully completed no services. Despite receiving referrals for a substance abuse assessment and treatment at Gateway and Family Guidance Center, Mother did not fully engage in those services. After going to a few sessions at Gateway, she was discharged because she did not maintain contact with the agency. Upon being readmitted to Gateway, she did not show up for three different readmission appointments in August 2020. She then went to

Family Guidance Center in October 2020, but she did not receive treatment there because she took keys from the facility and did not immediately return them. When she eventually returned to Gateway in November 2020, she was referred to PHP, but she refused and became aggressive with the staff. Though Mother claimed she refused PHP because it would prevent her from finding a job, she did not work at all during this nine-month period. By December 2020, Mother stopped attending drug screens because she believed her samples were being altered to ensure she tested positive for substances. Likewise, Mother did not follow up with other recommended services, particularly outpatient mental health treatment. No doubt to distract us from these failures, Mother points to her testimony that she participated in domestic violence and parenting classes during this time.

¶ 39        We cannot say Mother demonstrated reasonable progress during the nine-month period from July 2020 to April 2021. As we have previously explained, " 'reasonable progress' is an 'objective standard,' " measuring whether " 'the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody.' " (Emphasis in original.) *F.P.*, 2014 IL App (4th) 140360, ¶ 88 (quoting *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991)). Notably, Williams testified that she never felt comfortable recommending L.F. be returned to Mother "[b]ecause none of her services were completed[,] [s]he had made threats, her mental illness was still untreated," and "she was still testing positive for meth." Since Mother completed no services during this nine-month period or during the entire case, the court could not have returned L.F. to her custody during that time, let alone in the near future. Furthermore, Mother's inconsistent attendance at domestic violence and parenting classes lacked sufficient demonstrable quality to have allowed the court

to return L.F. to her custody in the near future because she still had not addressed the reasons L.F. had been removed from her care—her mental illness and substance abuse.

¶ 40    Taken together, all the evidence relating to Mother reveals she failed to make demonstrable, quality progress for the nine-month period of July 30, 2020, to April 30, 2021. See *In re K.H.*, 346 Ill. App. 3d 443, 455, 804 N.E.2d 1108, 1118 (2004) (explaining that section 1(D)(m)(ii) of the Adoption Act "mandates that parents must, with some degree of consistency, make reasonable progress toward their children's return home or risk forfeiting their parental rights"). The State, therefore, proved Mother an unfit person by clear and convincing evidence. And since the evidence does not point to the opposite result, the trial court's unfitness finding that Mother failed to make reasonable progress toward L.F.'s return home during the alleged nine-month period following the adjudication of neglect does not go against the manifest weight of the evidence. See *A.L.*, 409 Ill. App. 3d at 500.

¶ 41    Because we can affirm the trial court's unfitness finding on this basis, we need not consider the other statutory grounds on which the trial court found Mother unfit. *A.L.*, 409 Ill. App. 3d at 501 (citing *In re Katrina R.*, 364 Ill. App. 3d 834, 842, 847 N.E.2d 586, 593 (2006)) ("[O]n review, if sufficient evidence is shown to satisfy any one statutory ground, we need not consider other findings of parental unfitness.").

¶ 42                    B. Best-Interests Determination

¶ 43    Once a trial court finds a parent an "unfit person," it must next consider whether terminating that person's parental rights serves the child's best interests. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004); see also *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80, 966 N.E.2d 1107 (stating, once

the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). When considering whether termination of parental rights serves a child's best interests, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2020). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child."
>
> *Daphnie E.*, 368 Ill. App. 3d at 1072.

See also 705 ILCS 405/1-3(4.05) (West 2020).

¶ 44 A trial court's finding that termination of parental rights is in a child's best interest will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16, 73 N.E.3d 616.

- 15 -

¶ 45    Mother contends the trial court's determination terminating her parental rights goes against the manifest weight of the evidence because "she was doing the things that were asked of her and this family deserves the right to be reunited." The State, however, presented copious evidence showing Mother was not doing what was asked of her and that terminating her parental rights serves the best interests of L.F. Our focus must be on L.F. at this stage. See *D.T.*, 212 Ill. 2d at 364. The evidence showed that he is doing well in his current placement. The foster parents meet all his needs for food, shelter, and medical care. They aid in his community ties by making sure he attends school, day care, and social events. They help develop his identity by involving him in activities he enjoys; and they keep him connected to his background and biological family by taking him to family reunions and allowing him to visit with his siblings who live in Missouri. More importantly, L.F. had bonded with his foster parents, calling them "mom" and "dad," and he wanted to live with and be adopted by them. What is more, the foster parents expressed a willingness to adopt L.F.

¶ 46    After reviewing the above evidence, the trial court concluded that terminating Mother's parental rights served L.F.'s best interests and ensured him the permanent, stable, and loving environment that Mother could not provide. Since the evidence does not lead us clearly to opposite conclusions, we cannot say the trial court's best-interests determination goes against the manifest weight of the evidence. See *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 47                           III. CONCLUSION

¶ 48    For the reasons stated, we affirm the trial court's judgment.

¶ 49    Affirmed.